RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0305P (6th Cir.)
File Name: 00a0305p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CALPHALON CORPORATION,
       *Plaintiff-Appellant,*

      *v.*

No. 98-4319

JERRY ROWLETTE;
ROWLETTE & ASSOCIATES,
      *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 98-07305—David A. Katz, District Judge.

Submitted: November 2, 1999

Decided and Filed: September 8, 2000

Before: MARTIN, Chief Judge; DAUGHTREY, Circuit
Judge; HILLMAN, District Judge.[*]

_____

[*]The Honorable Douglas W. Hillman, United States District Judge
for the Western District of Michigan, sitting by designation.

1

_____

**COUNSEL**

**ON BRIEF:** Jenifer A. Belt, David W. Wicklund, Michael M. Briley, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Appellant. Richard R. Malone, MALONE & AULT, Toledo, Ohio, Marcy S. Wallace, COX, GOUDY, MCNULTY & WALLACE, Minneapolis, Minnesota, for Appellees.

MARTIN, C. J., delivered the opinion of the court, in which DAUGHTREY, J., joined. HILLMAN, D. J. (pp. 11-19), delivered a separate dissenting opinion.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Chief Judge. Calphalon Corporation, an Ohio corporation, appeals the district court's dismissal of a declaratory judgment claim against Jerry Rowlette and Rowlette and Associates because of a lack of personal jurisdiction. For the following reasons, we AFFIRM.

Jerry Rowlette ("J. Rowlette"), a resident of Minnesota, is shareholder, director, and president of Rowlette and Associates ("Rowlette")(The two defendants are also collectively referred to as "Rowlette."), a Minnesota-based corporation. Neither party owns any real or personal property in Ohio.

From 1980 to January 31, 1998, Rowlette was the exclusive manufacturer's representative for Calphalon – a Minnesota corporation with its principal place of business in Ohio – in the states of Minnesota, Iowa, North Dakota, South Dakota, and Nebraska. Between 1980 and 1996, a "letter agreement" controlled this arrangement. In both 1996 and 1997, Rowlette executed a one-year manufacturer's representative agreement.

assumption is not based on the fault of the defendant but on the interest of the state. A state has as much interest in resolving business differences before they cause damage as it has in providing a remedy once the damage has occurred.

401 F.2d at 384. Where, as here, the action seeks to adjudicate the rights of parties who have engaged in a seventeen year business relationship and to determine their respective obligations under the final contract between them, the action arises from the contacts established during that seventeen year relationship.

There can be little doubt both that Rowlette purposefully availed itself of the privilege of doing business with and causing consequences in Ohio and that the present action arises out of Rowlette's contacts with Ohio. Exercise of jurisdiction by Ohio in no way offends due process. Any other conclusion is inconsistent with controlling Supreme Court and Sixth Circuit precedent. Accordingly, I respectfully dissent.

Rowlette could not have occurred in Ohio since Rowlette's actions were taken in Minnesota. The majority therefore concludes that the action does not "arise from" Rowlette's contacts with Ohio.

The reasoning is fallacious for twin reasons. First, no case law suggests that in a contract action, personal jurisdiction may be established only when the defendant has breached that contract in the forum state. Indeed, since defendant Rudzewicz never entered Florida in relation to his agreement with Burger King, any breach necessarily occurred outside the forum state. The Supreme Court imposed no artificial requirement that personal jurisdiction depend upon the place of the defendant's allegedly wrongful conduct. *See Burger King*, 471 U.S. 462.

Second, the action at issue is not for breach of contract. Instead, it is an action for declaratory judgment on Calphalon's obligations under the manufacturer's representative agreement. No breach is asserted by Calphalon. Calphalon seeks only to adjudicate the parties' obligations under the very contractual arrangement that has established Rowlette's minimum contacts with Ohio.

Indeed, this court in *Southern Machine* expressly recognized that a declaratory judgment action unquestionably arises out of a business agreement. The court rejected both the notion that a defendant's breach of contract is required and the notion that the location of such breach is relevant to the jurisdictional analysis:

[M]any of the operative facts of this controversy arose from obligations created by the license agreement and from acts performed under that agreement. Mohasco's participation in establishing those obligations and in setting in motion that performance is clear. To suggest that Mohasco should not be joined in this action because it has been guilty of no breach of contract or bad faith conduct places emphasis on the wrong consideration. In personam jurisdiction is not assumed as punishment for the commission of a tort or the breach of a contract. Its

Rowlette agreed, in part, to promote the sale of Calphalon's products, to keep Calphalon informed of market conditions, and to develop sales plans for customers. During the term of the agreements, Rowlette corresponded with Calphalon in Ohio via telephone, fax, and mail, and J. Rowlette made two physical visits to Ohio in 1996: one for a mandatory sales meeting and another to accompany a client on a tour of the Calphalon facilities. The one-year agreement stated "this Agreement shall be interpreted under the laws of the State of Ohio." At the end of 1997, Calphalon notified Rowlette that it did not intend to renew the agreement. On May 2, 1998, counsel for Rowlette notified Calphalon by letter of Rowlette's claims for breach of contract and unpaid commissions.

On May 27, Calphalon filed suit in the United States District Court for the Northern District of Ohio, seeking a declaratory judgment that: Ohio law controls the agreement; Calphalon's termination of Rowlette was lawful; and Calphalon does not owe additional commissions to Rowlette. Subsequently, Rowlette filed suit in Minnesota state court, claiming Calphalon breached the manufacturer's representative agreement and seeking payment of earned commissions. Rowlette then filed a special appearance in the Ohio federal case and moved for dismissal of the Ohio action under Federal Rule 12(b)(2), alleging lack of personal jurisdiction.

The district court granted the motion to dismiss, finding that it lacked specific personal jurisdiction over Rowlette. The court gave some thought to the idea that Rowlette was subject to the Ohio long-arm statute, Ohio Rev. Code § 2307.382, but held that even under the long-arm statute Rowlette lacked sufficient minimum contacts with Ohio to meet due process requirements.

Dismissal for lack of personal jurisdiction is reviewed *de novo*. *See Tobin v. Astra Pharmaceutical Prods.*, 993 F.2d 528, 542 (6th Cir. 1993). In the absence of an evidentiary hearing, we must view the pleadings and affidavits in the light

most favorable to Calphalon and not consider the controverting assertions of Rowlette. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). Calphalon must make only a prima facie showing of personal jurisdiction. *See id.*

In dealing with a diversity case, we look to the law of the forum state to determine whether personal jurisdiction exists. *See LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1298 (6th Cir. 1989) (citing *Southern Machine Co. v. Mohasco Indus.*, 401 F.2d 374, 376 n.2 (6th Cir. 1968)). The exercise of personal jurisdiction is valid only if it meets both the state long-arm statute and constitutional due process requirements. *See Nationwide Mutual Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 793 (6th Cir. 1993) (citing *Reynolds v. International Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir 1994)). Although the Ohio Supreme Court has ruled that the Ohio long-arm statute does not extend to the constitutional limits of the Due Process Clause, our central inquiry is whether minimum contacts are satisfied so as not to offend "traditional notions of fair play and substantial justice." *See Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998) (citing *Goldstein v. Christiansen*, 638 N.E.2d 541, 545 n.1 (Ohio 1994) (per curiam)).

The parties here dispute whether the district court had specific personal jurisdiction over Rowlette under the three-part test established in *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d at 381:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

The district court found that Rowlette did not purposefully avail itself of the benefits of the laws of Ohio and that the

Rowlette agreed that Ohio law would govern the contract. Further, Rowlette attended mandatory meetings in Ohio as dictated by Calphalon. Such substantial contacts, which occurred in fulfilling a continuing contractual relationship, may not be considered fortuitous – they are intimately connected with the relationship itself and with the dispute in question. "[T]he 'quality and nature' of [Rowlette's] relationship to the company in [Ohio] can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" *Burger King*, 471 U.S. at 480.

Under the jurisdictional analysis set forth by the Supreme Court, the facts of this case unquestionably support a conclusion that Rowlette purposefully availed itself of the privilege of conducting activities in Ohio. *See Burger King*, 471 U.S. 462, 475 (1985).

The majority also concludes that the second prong of *Southern Machine* is not met because the dispute did not arise from Rowlette's contacts with the state. This secondary conclusion, however, is dependent on the majority's primary conclusion that no purposeful availment occurred, and the majority applies a gloss to the second requirement not contemplated by precedent.

As the majority notes, the "arising from" requirement is satisfied when the operative facts of the controversy arise from the defendant's contacts with the state. *See Southern Machine*, 401 F.2d at 384 n.29 ("Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from the contract."). A suit over the termination of a seventeen-year business relationship unquestionably arises from the minimum contacts established during that seventeen-year relationship.

The majority, however, distorts this straightforward requirement by demanding that the specific conduct leading to the action must have taken place in the state seeking to assert personal jurisdiction. The majority reasons that the action is one for breach of contract and that any breach by

the reasonable foreseeability of being sued in a state. *See id.* at 476 ("[T]erritorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there . . . ."). In the instant case, Rowlette was physically present in Ohio on a periodic basis – at Calphalon's insistence and as required by Rowlette's relationship with Calphalon. Rowlette clearly contemplated being periodically haled into Ohio by Calphalon for business purposes. It therefore was entirely reasonable for Rowlette to contemplate being haled into Ohio court by Calphalon.

Rather than applying the atomistic analysis used by the majority, *Burger King* and other Supreme Court cases admonish us to apply

a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Id.* at 479 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316-17 (1943)). As a result, the real question before the court in evaluating personal jurisdiction is the nature and extent of Rowlette's relationship with Calphalon, who is and always has been located in Ohio. Rowlette engaged in an intentional relationship with Calphalon to sell its products for seventeen years. Under its contract with Calphalon, Rowlette promoted Calphalon products, transmitted orders to Calphalon, extended Calphalon's business, and reported to Calphalon on the activities of competitors in the region. Calphalon supplied samples to Rowlette, paid commissions to Rowlette, and refrained from appointing any other representative in Rowlette's region.

declaratory judgment action did not arise from Rowlette's activities in Ohio.

The purposeful availment prong of the *Southern Machine* test is essential to a finding of personal jurisdiction, *LAK*, 885 F.2d at 1300:

This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts. There is a difference between what *World-Wide Volkswagen* calls a mere "collateral relation to the forum State," and the kind of substantial relationship with the forum state that invokes, by design, "the benefits and protections of its laws." An understanding of this difference is important to the proper application of the "purposeful availment" test.
  The Supreme Court has emphasized, with respect to interstate contractual obligations, that "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequence of their activities."

(Citing *Burger King v. Rudzewicz*, 471 U.S. 462 (1985); *World-Wide Volkswagen v. Woodson*, 444 U.S. 286 (1980); *Hanson v. Denckla*, 357 U.S. 235 (1958).)

Calphalon asserts that Rowlette purposefully availed itself of the benefits of the laws of Ohio through its association with Calphalon as a manufacturer's representative. Calphalon presents the following facts to demonstrate purposeful availment: the 1997 agreement that is the subject of this declaratory judgment action; the agreement's choice of law provision; Rowlette's duties to monitor market conditions and report to Calphalon; Rowlette's telephone and fax contacts with Calphalon; J. Rowlette's visits to Calphalon offices in Ohio; and Rowlette's letter threatening litigation.

We think the district court correctly recognized that the mere existence of a contract between Rowlette and an Ohio

citizen for seventeen months is insufficient to confer personal jurisdiction over Rowlette. *See Nationwide*, 91 F.3d at 795 (citing *Burger King*, 471 U.S. at 478). In *Burger King*, 471 U.S. at 479, the Supreme Court stated that "prior negotiations and contemplated future consequences, along with the terms of the contract and parties' actual course of dealing" must be considered to determine whether "the defendant purposefully established minimum contacts within the forum." We interpret this statement to mean that the parties' actions "in the negotiation and performance of the . . . agreement" are more important factors to consider than the duration of the contract in determining whether this case "should be subject to suit in Ohio." *See Nationwide*, 91 F.3d at 796. Moreover, in *LAK*, 885 F.2d at 1301, we noted that the *quality* rather than the *quantity* of the contacts is the proper subject of review. Similarly, we should focus here on the *quality* of the parties' relationship, rather than the *duration* of the relationship.

In examining the *quality* of the parties' relationship, we find that the actual course of dealings between the parties demonstrates that Rowlette's contacts with Ohio were purely "fortuitous" and "attenuated." In *Kerry Steel Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 151 (6th Cir. 1997), we held that an out-of-state defendant-buyer did not purposefully avail itself of the benefits and protections of the forum state's laws because, in part, no facts connected the subject matter or performance of the contract at issue to the forum state. Furthermore, we held that any negative economic effect on the in-state plaintiff-seller did not create a determinative impact on the state economy, as "'the locus of such a monetary injury is immaterial, as long as the obligation did not arise from a privilege the defendant exercised in the forum state.'" *Id*. (quoting *LAK*, 885 F.2d at 1303). Likewise, in *International Technologies Consultants v. Euroglas*, 107 F.3d 386, 395 (6th Cir. 1997), we found it "purely fortuitous" that the foreign defendant-seller had any contact with Michigan. The defendant was not attempting to "exploit any market for its products" in the state of Michigan, but rather had contact with the state only because the plaintiff

terms that while Rowlette was on notice that the contract would be governed by Ohio law, "it did not make a deliberate affiliation with th[e] state and could not reasonably foresee possible litigation there." Majority opinion, slip op. at 7.

Fourth, the majority ignores years of telephone, fax and mail contacts, focusing instead on a single letter from Rowlette to Calphalon threatening litigation. The majority concludes that such a letter is insufficient to create personal jurisdiction. But as the *Burger King* Court recognized, much modern commercial activity is conducted by mail and wire communications, obviating need for physical presence, and as long as a "commercial actor's efforts are 'purposefully directed' towards residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* at 476. All of Rowlette's telephone and mail communication, not just a single letter, should have been considered.

The majority suggests, however, that other communications were irrelevant and that the nature of Rowlette's relationship with Ohio was "fortuitous" because Rowlette did not care where Calphalon was located and "[a]rguably . . . would have served as Calphalon's representative in the designated states, regardless of Calphalon's base of operations." The majority's reasoning conflicts with the Supreme Court's decision in *Burger King*. The *Burger King* Court did not conclude that Rudzewicz's "phone, mail and fax contact . . . and physical visits" were "fortuitous" on the basis that they "occurred solely because [Burger King] chose to be headquartered in [Florida]." Majority opinion, slip op. at 6-7. If the majority's reasoning is credited, the rationale will undermine a finding of personal jurisdiction in virtually all commercial relationships because "arguably" no distributor or buyer reasonably is concerned with where a product is made.

Finally, the majority dismisses without discussion Rowlette's periodic physical presence in Ohio as fortuitous. The Supreme Court squarely has recognized that physical presence within the state, while not mandatory, will bolster

Ohio to Ohio citizens, suggesting that to establish jurisdiction, the defendant must exploit the end market in the forum state. Such a suggestion makes no sense at all and, with all due respect, is patently absurd. In *Burger King*, the franchisee sold no hamburgers in Florida. The Supreme Court did not consider the identity of Rudzewicz's ultimate customers; it considered the identity and relationship with the relevant Florida resident – Burger King, Inc.

In the instant case, Rowlette had extensive contacts and an ongoing relationship with the only Ohio citizen of relevance for purposes of the *Burger King* analysis – Calphalon. Rowlette  intentionally sought to enter into and maintain a relationship with an Ohio corporation over an extended period of time, which in turn led to numerous commercial transactions between them. *See Southern Machine Co. v. Mohasco Ind., Inc.*, 401 F.2d 374, 382 (6th Cir. 1968) (recognizing that although defendant had not solicited the original agreement, it unquestionably had purposefully availed itself of the license agreement at issue in the case). The relationship to Ohio is not rendered fortuitous simply because Calphalon originally chose where to establish its business.

Third, the majority casually dismisses as unimportant the fact that the parties agreed that the manufacturer's representative contract would be governed by Ohio law. The majority, of course, recognizes that multiple decisions have held that such choice-of-law provisions are relevant to a finding of personal jurisdiction. *See Burger King*, 471 U.S. at 482 (choice-of-law provision, while not sufficient standing alone to confer jurisdiction, is relevant factor in determining whether party purposefully availed itself of the forum); *Euroglas*, 107 F.3d at 393 (emphasizing choice-of-law provision as significant factor) (citing *Burger King*, 471 U.S. at 482, and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1264 (6th Cir. 1996) (finding purposeful availment in part because of choice-of-law provision in contract). Yet the majority simply declares in conclusory

chose to reside there. *See id*. These contacts differ from the defendant's efforts in *Lanier v. American Board of Endodontics*, 843 F.2d 901 (6th Cir. 1988), which we held to demonstrate purposeful availment. In *Lanier*, 843 F.2d at 911, the foreign medical certification board sought to associate with the in-state plaintiff to further its business and create "continuous and substantial" consequences in the state.

In this case, the agreement and previous association between Calphalon and Rowlette centered on Rowlette representing Calphalon in the states of Minnesota, Iowa, South Dakota, North Dakota, and Nebraska. Rowlette's performance of the agreement was not focused on exploiting any market for cookware in the state of Ohio. Moreover, Rowlette's phone, mail, and fax contact with Calphalon in Ohio and J. Rowlette's physical visits there occurred solely because Calphalon chose to be headquartered in Ohio, not because Rowlette sought to further its business and create "continuous and substantial" consequences there. *See id.* Arguably, Rowlette would have served as Calphalon's representative in the designated states, regardless of Calphalon's base of operation. Thus, Rowlette's contacts were precisely the type of "random," "fortuitous," and "attenuated" contacts that the purposeful availment requirement is meant to prevent from causing jurisdiction.

The district court also did not err in determining that the choice of law provision in the 1997 agreement is not decisive. The Court in *Burger King*, 471 U.S. at 482, stated that a choice of law provision, though alone insufficient to establish jurisdiction, can "reinforce [a] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." Moreover, we found in *CompuServe*, 89 F.3d at 1264, that the choice of law provision provided the out-of-state defendant, who purposefully transacted business in Ohio, with notice that he had entered written contracts governed by Ohio law. Here, even though Rowlette was on notice that the contract was to be governed by Ohio law, it did not make a deliberate affiliation with that state nor could it reasonably foresee possible litigation there.

The district court did not address Rowlette's correspondence by counsel expressing claims against Calphalon. We have recognized that the threat of litigation can be a factor supporting purposeful availment. In *American Greetings*, 839 F.2d at 1170, the defendant, over a nine-month period, sent numerous letters, made numerous phone calls, and appointed local agents who pursued his claims with the plaintiff. In *CompuServe*, 89 F.3d at 1266, the defendant sent numerous electronic mail messages and letters threatening suit and posted his version of the parties' dispute on CompuServe's Ohio-based computer server. In this case, Rowlette's counsel sent one letter to Calphalon, in lieu of an impending acquisition of the company, to outline Rowlette's possible claims for the benefit of the acquiring company. This contact is not as significant as that occurring in *American Greetings* and *CompuServe* and does not significantly alter the nature of Rowlette's contacts with Ohio. Thus, in our view, the district court was correct in holding that Calphalon failed to demonstrate that Rowlette had purposefully availed itself of the benefits and protections of the laws of Ohio.

After finding that Rowlette failed to satisfy the purposeful availment prong under the *Southern Machine* test, the district court also addressed the second and third prongs of the test. The "arising from" requirement under the second prong is satisfied when the operative facts of the controversy arise from the defendant's contacts with the state. *See Southern Machine*, 401 F.2d at 384. "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract." *Id*. at n.29.

Though the district court correctly held that the contract dispute at issue did not arise from Rowlette's activities in Ohio, its reasoning for reaching that conclusion is flawed. Rather than look to where the operative facts of the controversy arose, the lower court focused on which party's action caused an alleged breach of the contract. We have recognized that a breach of contract action arises from the

and addressing them seriatim, rather than viewing the relationship in its entirety.

First, for example, although the majority recognizes that the parties in the instant case had a seventeen-year business relationship during which Rowlette served as the exclusive sales representative for Calphalon in a five-state area, the majority summarily concludes that such a relationship is not a "continuing business relationship" within the meaning of *Burger King* and that the contacts created by this series of agreements are merely "fortuitous." The majority entirely dismisses the duration of the relationship, stating only that the "quality" of the relationship, not the "quantity" is controlling. The majority then declares that the "quality" of the relationship has only a fortuitous relationship with Ohio, citing the wholly inapposite and distinguishable cases of *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 151 (6th Cir. 1997) (holding that a contract governing a one-time sale and purchase of a product negotiated by fax and phone is insufficient to establish minimum contacts where delivery actually occurred in another state), and *International Technologies Consultants, Inc. v. Euroglas*, 107 F.3d 386, 395 (6th Cir. 1997) (holding that consulting contract that was initiated by plaintiff Michigan company in Europe, for development of a European facility and governed under European law was insufficient to establish jurisdiction over defendants, particularly in light of the special considerations involving international defendants). In the instant case, in contrast, the "quality" of the continuing relationship that has actually occurred between Rowlette and Calphalon during the many years of their arrangement is precisely the kind of relationship deemed sufficient by the Supreme Court in *Burger King*. In fact, in *Burger King*, the Court held that such a continuing relationship was sufficient where it had been merely agreed to by the contracting parties. Here, the parties not only agreed to that kind of continuing relationship, they actively pursued it for seventeen years.

Second, in the course of its discussion, the majority repeatedly observes that Rowlette did not sell products in

Burger King, Inc., a Florida corporation, to operate a Burger King franchise in Detroit, Michigan. Shortly thereafter, a dispute arose over defendant's operation of the franchise under the franchise agreement, and Burger King brought an action in the United States District Court for the District of Florida. In analyzing the question of Florida's jurisdiction over Rudzewicz, the Supreme Court recognized that an individual's one-time contract with an out-of-state party "*alone* can[not] establish sufficient minimum contacts in the other party's home forum . . . ." *Id.* at 478 (emphasis in original). The Court reiterated, however, that "where the defendant 'deliberately' has engaged in significant activities within a state . . . or has created 'continuing obligations' between himself and residents of the forum . . . he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 475-76 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984), and *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648 (1950)). *See also LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1300 (6th Cir. 1989) ("The Supreme Court has emphasized, with respect to interstate contractual obligations, that 'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities.'") (quoting *Burger King*, 471 U.S. at 473) (internal quotations omitted). Applying that reasoning, the *Burger King* Court held that Rudzewicz's negotiation of a 20-year agreement with Burger King, which contemplated "continuing and wide-reaching contacts with Burger King in Florida . . . can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" *Id.* at 480 (citations omitted).

Despite citing language from *Burger King*, the majority appears to disregard its fundamental import. The majority arrives at its finding of no personal jurisdiction by breaking the argument and evidence into discrete and distorted portions

defendant's contact with the state because the contract "is necessarily the very soil from which the action for breach grew." *In-Flight*, 466 F.2d at 228. In *Kerry Steel*, 106 F.3d at 151, we found the "arising from" requirement was not satisfied because defendant's alleged breach by failure to pay the purchase price occurred out of state.

However, if the actual breach does not arise from "the very soil from which the action for breach grew," the exercise of jurisdiction may still be deemed reasonable if, according to the third prong of the *Southern Machine Co.* test, the consequences of the act or breach caused by the defendant have a substantial enough connection with the forum state. In *LAK*, 885 F.2d at 1303, we noted that "if the contract had borne a more substantial relationship to Michigan [the forum state], it would not have been necessary for [the alleged tortious conduct] actually to have [occurred] in Michigan."

In this case, the facts at issue did not occur in the forum state nor were the consequences of the breach substantially connected to the forum state. Rowlette's performance of the terms of the agreement and any earning of commissions occurred in the states of Rowlette's sales territory, not Ohio. Moreover, because Rowlette's connection with Ohio was not substantial as required by the third prong of the *Southern Machine Co.* test, it is necessary for the plaintiff to demonstrate that the facts at issue actually occurred in the forum state. *See Southern Machine Co.,* 401 F.2d at 381. Here, Calphalon cannot show that Rowlette had a substantial connection to the state. Therefore, the cause of action does not arise from Rowlette's contact with Ohio, nor do the consequences of its acts have a substantial enough connection with Ohio to make the exercise of jurisdiction over the defendant reasonable. *See id.*

Under the jurisdictional analysis set forth by the Supreme Court in *Burger King* and by this circuit in *Southern Machine Co.* and other cases, we find that Rowlette did not purposefully avail itself of the privilege of conducting activities in Ohio and that the *quality* of its relationship to

Calphalon in Ohio can reasonably be viewed as "random," "fortuitous," or "attenuated." *See Burger King*, 471 U.S. at 480. Accordingly, we AFFIRM the district court's grant of Rowlette's motion to dismiss for lack of personal jurisdiction.

_____

**DISSENT**

_____

DOUGLAS W. HILLMAN, District Judge, dissenting. I respectfully dissent. The majority opinion has failed to demonstrate how the exercise of jurisdiction by the district court of Ohio would be fundamentally unfair or that the Due Process Clause is offended when defendants have meaningful "contacts, ties or relations" with the State of Ohio. *See International Shoe Co. v. State of Washington*, 326 U.S. 310, 319 (1945).

In its opinion, the majority goes to great lengths to minimize the seventeen-year continuing business relationship between these parties and to broaden the notion of "fortuitous" contacts so as to expand the concept beyond all recognition. While citing the relevant controlling language from the cases, the majority distorts and distinguishes the facts of this case in ways that render those controlling decisions meaningless. In the end, the instant decision is almost unrecognizable under modern notions of personal jurisdiction, harking back to the days of *Pennoyer v. Neff*, 95 U.S. 714 (1878) (requiring physical presence in a state at the time process is being served), *overruled by International Shoe*, 326 U.S. 310 (establishing new test that "due process requires only that in order to subject a defendant to a judgment in personam, . . . [the defendant] have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'").

This case falls squarely within the holding of *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985), and is indistinguishable in all relevant respects. In *Burger King*, the Supreme Court considered whether Florida had properly exercised jurisdiction over a Michigan resident in an action involving a dispute over a franchise agreement. Defendant John Rudzewicz and Brian MacShara, both Michigan residents, entered into a 20-year franchise agreement with