HILLERICH & BRADSBY
CO. Plaintiff

v.

Danny HALL Defendant

No. CIV.A.300CV524H.

United States District Court,
W.D. Kentucky,
at Louisville.

June 11, 2001.

---

John K. Bush, Christie A. Moore, Greenebaum Doll & McDonald, Louisville, KY, for Plaintiff.

William A. Clineburg, Jr., Matthew A. Boyd, King & Spalding, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This matter is before the Court on Defendant's motion to dismiss for lack of personal jurisdiction. Plaintiff is Hillerich & Bradsby Co. ("H & B"), a Kentucky corporation with its principal place of business in Louisville, Kentucky. H & B manufactures and markets Louisville Slugger bats and other baseball equipment. Defendant, Danny Hall, is the head baseball coach at Georgia Tech University. Hall resides and works in Georgia.

In 1995, Hall and H & B entered into an "Advisory Staff Coach Research and Development, Product Testing and Usage Agreement" (the "Agreement"). In June, 2000, Hall attempted to terminate the Agreement. Thereafter, H & B sued Hall in this Court, seeking an injunction and claiming breach of contract, misappropriation of publicity rights, false endorsement under Section 1125 of the Lanham Act, unfair competition, and interference with business relationships.

In the motion to dismiss, Hall argues that his activities relating to his contractual relationship with H & B are insufficient to support personal jurisdiction in this case. This is a difficult question, which has been vigorously and expertly argued by both sides. Nevertheless, for the reasons stated, the Court concludes that Hall's limited personal contacts with the state of Kentucky make this Court's exercise of personal jurisdiction over him improper.

## I.

Since this Court has not conducted an evidentiary hearing to determine jurisdiction, the pleadings and affidavits must be viewed in the light most favorable to H & B and not consider Hall's version of any disputed facts. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir.2000). The disputes here are minimal and the parties agree on most everything that happened, but strongly disagree over the legal significance of these events.

In early 1995, H & B was interested in talking with certain college baseball coaches about promotional contracts. Hall, the head coach of Georgia Tech, was one of those coaches. H & B made some indirect inquiries concerning Hall's availability for contract. Sometime in March 1995, Hall placed a telephone call to Rex Bradley, an

H & B Vice President in Louisville. They briefly discussed H & B's interest in signing coaches, such as Hall. Bradley referred Hall to Jack MacKay, who was primarily responsible for signing college coaches to use and promote H & B products. MacKay was based in Mt. Pleasant, Texas. Naturally, he reported to the Louisville offices of H & B, but he worked from Texas to sign college coaches throughout the country. Working from Texas, MacKay negotiated the Agreement with Hall.

Generally speaking, the Agreement provides that Hall, through his Georgia Tech team, would exclusively use H & B products and provide exposure by the exclusive use of those products during the term of the Agreement. In return, H & B agreed to pay Hall $30,000 per year as well as certain additional performance bonuses. H & B agreed to deliver Hall certain H & B baseball products having an approximate annual value of $40,000. The Agreement also provided that Hall would provide certain consultation, advice, field testing, and evaluation of H & B products. Finally, the Agreement provided that it should be construed under the laws of Kentucky. The parties dispute the precise length and duration of the Agreement. H & B contends that the Agreement was for a six-year term, automatically renewable for another six years. Hall contends that he may terminate the Agreement at the conclusion of the initial six-year term.

During the initial term of the Agreement, Hall received checks from H & B in the amount of $192,500. Moreover, every year H & B delivered a large amount of baseball equipment and products to Georgia Tech. During the first several years of the Agreement, Hall would order baseball H & B equipment by calling or faxing Jack MacKay in Texas. After MacKay and H & B terminated their relationship, Hall made his equipment requests by calling or faxing H & B offices in Louisville. The total retail value of Hall's equipment orders over the initial term of the contract has been approximately $240,000.

Other than ordering equipment from H & B, Hall has had only incidental contact with H & B in Kentucky. Hall probably had several phone conversations a year with James Sass, an H & B official, concerning bat specifications and other equipment. From time to time, Hall and H & B exchanged some correspondence. As part of the Agreement, H & B retained the rights to Hall's name and picture and the Georgia Tech name and logo for its promotional and marketing materials. H & B did so by using Hall's picture and the Georgia Tech name in a logo in approximately 80,000 of its catalogs distributed each year.

Hall did nothing further on behalf of H & B in connection with the Agreement. Hall never traveled to Kentucky to meet with H & B officials. Neither Hall nor Georgia Tech traveled to Kentucky to perform any coaching or other baseball duties. On the other hand, from H & B's perspective, all of the contract coordination, including the ordering of goods and materials, was coordinated from its Louisville offices.

## II.

In order to determine whether personal jurisdiction exists over a nonresident defendant in a diversity action, this Court must apply Kentucky law, the state in which it sits, subject to due process limitations. *See Welsh v. Gibbs,* 631 F.2d 436, 439 (6th Cir.1980); *Gateway Press, Inc. v. LeeJay, Inc.,* 993 F.Supp. 578 (W.D.Ky.1997). Kentucky's long-arm statute provides that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's ... [t]ransacting

any business in this Commonwealth" KENT. REV. STAT. ANN. § 454.210(2)(a) (Lexis 2001). This provision permits Kentucky courts to exercise jurisdiction to the fullest extent permitted by due process. *See Info–Med, Inc. v. National Healthcare, Inc.*, 669 F.Supp. 793, 795–96 (W.D.Ky. 1987). Accordingly, this Court will merge the question of how far Kentucky intended its long-arm jurisdiction to reach into the question of whether taking jurisdiction in this case would comport with the requirements of due process. *See First Nat'l Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1125 (6th Cir.1982). The plaintiff has the burden of establishing personal jurisdiction over the defendant. *See Welsh*, 631 F.2d at 438. However, when the court decides the jurisdictional issue based only upon the written submissions of the parties, the plaintiff meets this burden by making a prima facie case of jurisdiction. *Id.*

 In order to subject a nonresident defendant to personal jurisdiction without violating due process, the defendant must have "minimum contacts" with the forum "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quotation omitted). This Court will employ the familiar three-part test followed in the Sixth Circuit for determining whether a nonresident defendant has the requisite minimum contacts:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the

forum state to make the exercise of jurisdiction over the defendant reasonable. *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968) (footnote omitted). This jurisdictional inquiry is not a "mechanical test," and a court must "consider the jurisdictional facts of each case individually [in order] to make judgments as to the substantiality of contacts with the forum state and the fairness and justice of subjecting a specific defendant to the in personam jurisdiction of the forum state." *In–Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 225–26 (6th Cir.1972). The purposeful availment prong of the *Southern Machine* test may be satisfied in a case arising out of a contract if the facts show that the nonresident defendant entered into a "substantial business contract" with a party in the forum. *First Nat'l Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir.1982); *see also In–Flight Devices*, 466 F.2d at 227. In making this determination, the Court must consider the prior negotiations of the parties, the future consequences contemplated by the parties, the terms of the contract, and the parties' actual course of dealing. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478–79, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). No single factor is the overriding one. Rather, the Court's conclusion will emerge from a careful evaluation of all of the facts and circumstances of the parties' business relationship taken as a whole.

### III.

First, this Court considers whether Hall "purposefully avail[ed] himself of the privilege of acting in [Kentucky] or causing a consequence in [Kentucky]." To be sure, Hall signed a multi-year contract with a Kentucky corporation and that contract calls for the application of Kentucky law. H & B shipped goods to Hall and disbursed significant sums of money to him

from Kentucky. To accomplish all of this, Hall phoned and faxed H & B several times each year. H & B, in turn, used Hall's image and that of his Georgia Tech team in its national promotional activities. These factors all suggest the potential for the exercise of personal jurisdiction.

Nevertheless, the Court concludes that other, more important factors substantially diminish the significance of these facts. Though Hall may have made the first phone call to Louisville, H & B was seeking the services of major college baseball coaches. H & B knew of Hall and initiated contact through intermediaries. H & B's man, MacKay, who worked out of Texas, was in charge of recruiting these coaches. Though Hall may have called H & B first, MacKay negotiated the contract on H & B's behalf from Texas. The contract was neither negotiated or signed in Kentucky. Hall never visited Kentucky. Thus, in the initial negotiations, Hall did almost nothing to purposefully avail himself of doing business in Kentucky.

 Hall performed his part of the Agreement—exclusively using H & B baseball products—entirely outside of Kentucky. He performed no services in Kentucky nor did he or his team travel to Kentucky. More importantly for this analysis, Hall's efforts were never purposefully directed toward Kentucky. He did not profit by work or efforts directed toward Kentucky. In fact, almost every one of the Kentucky connections which H & B cites are those arising from H & B's own presence in the state, rather than Hall's purposeful reaching out to the state or to H & B. The unilateral activities of those who have a relationship with a non-resident defendant cannot satisfy the requirement of sufficient contact with the forum state. *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174; *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722 (6th Cir.2000). All of

the significant Kentucky contacts in this case involve H & B performing some action in the state for its own benefit.

 Hall's contacts, though extending over a lengthy time, were more random and limited than they were continuous and significant. The record suggests that Hall initiated only one or two contacts of any kind annually with Kentucky during the last years of the Agreement. His relationship to Kentucky and H & B was almost entirely passive: he received goods and services from the state, rather than providing anything to or purchasing anything from the state; he did not actually provide services, he merely continued to perform his duties as Georgia Tech's baseball coach, for which he received payment. In sum, his duties were carried out entirely outside the state. Consequently, Hall's duties under the Agreement benefitted H & B outside of Kentucky and only from those benefits did H & B receive financial gain. Even though the amount of money paid by H & B to Hall is important, in the Court's view, it is much more significant that Hall performed no direct services for H & B and that his job was performed entirely outside the state. *See In–Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 227 (6th Cir.1972).

Reviewing all the cases, one can find those which cite any number of these factors as being insufficient alone or significant when combined with others in the jurisdictional analysis. That is why every case must be viewed on its own collective facts. In this case, the Court is particularly persuaded by (1) Hall's limited contacts with Kentucky generally, (2) the passive nature of those limited contacts with Kentucky, and (3) the absence of any obligations performed by Hall in Kentucky. In this Court's view, these facts demonstrate that Hall never purposely availed himself of the benefits or protections of the

state and they fall short of showing that Hall actually transacted business in Kentucky to a degree sufficient to justify this Court's exercise of jurisdiction under the Kentucky Long Arm Statute.

This case raises similar issues to those the Court faced in *Gateway Press, Inc. v. LeeJay, Inc.*, 993 F.Supp. 578 (W.D.Ky. 1997). Though the jurisdictional determination is necessarily an individualized examination, *see In–Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 225–26 (6th Cir.1972), certain general principles help guide this Court's resolution of the current case. In *Gateway Press*, an out-of-state defendant entered into an agreement for the development and printing of over 1.5 million catalog inserts at a Kentucky printing plant and title passed to the defendants upon delivery to the transport company at the Kentucky plant. Unlike the current case, the contract was performed in Kentucky and the defendant received the goods in Kentucky. With such purposeful availment in *Gateway Press*, jurisdiction over the out-of-state defendant was proper. Hall's actions, however, do not rise to the same level of purposeful interaction with Kentucky as did the defendant's actions in *Gateway Press*. Because this Court determines that Hall does not meet the first jurisdictional requirement set out in *Southern Machine*, it need not consider the remaining prongs of the test.

### IV.

H & B strongly argues that the Agreement's assignment of exclusive rights to use Hall's name and likeness support jurisdiction in Kentucky as the situs of those property rights. This argument deserves a separate comment.

In the Agreement, Hall agreed to let H & B use his image but, importantly, Hall himself did not use his image in Kentucky, direct the use of his image in Kentucky, or even take steps in Kentucky to assist H & B's use of his image. In this jurisdiction analysis, Hall's alleged interference with these property rights is no different than his interference with other parts of the Agreement. Any breach or interference with any part of the Agreement by Hall would presumably cause injury in Kentucky, but that injury alone cannot support personal jurisdiction if Hall did not purposely avail himself of the forum. *See Burger King*, 471 U.S. at 475, 105 S.Ct. 2174. Finally, unlike the cases cited by H & B, the property rights in Hall's likeness existed only because of the Agreement. Hall did not, for example, try to misappropriate or duplicate H & B's preexisting property rights as the defendants did in *Digital Equipment Corp. v. AltaVista Technology, Inc.*, 960 F.Supp. 456 (D.Mass.1997), or *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Limited Partnership*, 34 F.3d 410 (7th Cir. 1994).

Hall's assignment of his name and likeness was merely one part of the Agreement, and that it gave certain rights to H & B does not remove the Agreement from the standard jurisdictional analysis. To view this contract differently would create a property rights exception to the purposeful availment requirement, allowing jurisdiction anywhere the fictional situs of such property may meander. The Court does not believe that the assignment of one's name and likeness as here justifies such a significant impact on jurisdiction. Hall did not purposely avail himself of Kentucky, and as such, cannot be subject to jurisdiction here.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Defendant has moved to dismiss this case for lack of personal jurisdiction. For

the reasons set forth in the accompanying Memorandum Opinion, the Court agrees that it lacks personal jurisdiction over Defendant as to the allegations set forth in the complaint. Being otherwise sufficiently advised,

˙ IT IS HEREBY ORDERED that this Court lacks personal jurisdiction over Defendant Hall and, therefore, this case is DISMISSED WITHOUT PREJUDICE.