**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0349n.06
Filed: June 18, 2008

No. 07-5661

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FRANK HARRIS,

      Plaintiff-Appellant
      Cross-Appellee,

v.

LLOYDS TSP BANK, PLC,

      Defendant-Appellee,
      Cross-Appellant.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

_____/

BEFORE:    SUHRHEINRICH, CLAY, and COOK, Circuit Judges.

    **SUHRHEINRICH, Circuit Judge.**  Frank Harris sued Lloyds TSB Bank PLC ("Lloyds") after allegedly becoming a victim of a fraudulent Ponzi scheme whose perpetrators were customers of Lloyds. The district court granted summary judgment to Lloyds. Harris appeals that decision and Lloyds cross-appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction. We conclude that the district court lacked personal jurisdiction. We therefore reverse the judgment of the district court and remand with instruction to dismiss without prejudice.

**I. Background**

**A. Facts**[1]

---

[1]The underlying facts are discussed in greater detail in *Hardcastle v. Harris*, 170 S.W.3d 67 (Tenn. Ct. App. 2004).

Harris, a Tennessee resident, aspired to develop a theme park in Tennessee, at an estimated cost of $50 billion, but needed start-up funds for the project. Around 1997, Harris met Ron Hogsed, also a Tennessee resident, and president of Merit Quest, who told Harris of a method for raising large sums of money by repeatedly buying and selling United States Treasury Bills ("T-bills") through its "Asset Enhancement Program." According to the program materials, a participant would transfer funds to the "Program Attorney Client Trust Account;" which the "Program Attorney" would exchange for T-bills, which would then be "held in a Master Custodial Numbered Account for the benefit of the Corporate Participant." Harris understood that an individual named Monica Bond was the "Program Attorney." Harris also understood the document's reference to the "Program Attorney Client Trust Account" to mean an account with a company called Merit Quest, account number 18004546. Harris claimed that Hogsed told him that the bank account was at Lloyds and was a "trust account," "insured" by Lloyds, but Harris never attempted to confirm this information.

On March 9, 1999, Monica Bond, a United Kingdom citizen, instructed Lloyds Bank, which is incorporated in England and Wales with its headquarters in London, England, to open a U.S. dollar account in the name of "The Bond Partnership Client Account Re: Hercules Holdings" for her client, Hercules Holdings. Lloyds Bank opened the account and assigned it account number 11287303. This account was not a trust account for Merit Quest and did not have the account number 1800 4546, and none was ever created.

Harris became an agent of Merit Quest and entered into an agreement with Hogsed by which Harris would earn a ten percent commission on all funds wired to Merit Quest accounts, as well as 50% of the monthly earnings after these funds were invested. The Agreement provided in part that "[a]ll monies that have and will be wired to Merit Quest's accounts in Erwin, Tennessee and London, England, (from the clients introduced by Frank Harris/Impact) will be held in trust and secured by

Ron Hogsed/Merit Quest on behalf of all parties, which include investors, brokers, and Frank Harris/Impact." Harris recruited several others and together they convinced 118 individuals to invest in Merit Quest. Between April and October 1999, Hogsed transferred over $990,000 in "commissions" and "earnings" to Harris's bank account from the Merit Quest scheme. Hogsed later confirmed that these payments to Harris did not derive from any earnings of the program, but from the money deposited by later investors, in the nature of a Ponzi scheme.

Harris also invested personal funds. On June 23, 1999, Harris invested $10,000 in the Merit Quest Program by wiring the fund to Hogsed's First Tennessee Bank account in Erwin, Tennessee for Merit Quest. On September 17, 1999, Harris instructed his bank, The Bank of Goodlettsville, by telephone, to wire another $200,000 to Lloyds Bank in London. Harris obtained the wire instructions from Hogsed. On a form entitled "Instructions for Bank Wire," Harris indicated that the "Beneficiary" was "The Bond Partnership Client Account, Ref Hercules Holdings" with an account number of "11 28 73 03." Harris listed the "Receiving Bank" as being "Lloyds Bank plc" in London, England. This form also has a section entitled "Further Ref." In this section, Harris listed "Merit Quest Management International Ltd, Acct # 1800 4546." The Bank used this document to complete the "Wire Transfer Request Form." The Wire Transfer Request Form lists the "Originator" of the wire as "Frank A. Harris." The "Receiving Bank" was listed as "Lloyds Bank PLC, Berkeley Square House." The "Beneficiary" of the wire was "The Bond Partnership Client Account." The "Beneficiary's Address" was provided, as well as the "Beneficiary Account Number," which the bank stated as "11 28 73 03." Under "Special Instructions" The Bank of Goodlettsville listed "Ref Hercules Holdings/ F/C Merit Quest Management Int'l Ltd Acct #1800 4546." This was the only time Harris wired money to an account at Lloyds. Harris understood that the money was placed into

-3-

the Bond Partnership Account, and that this account was controlled by Bond and another individual named Bill Cook.

Harris's money was electronically wired from his bank in Goodlettsville, Tennessee, to Harris Bank International in New York via the Fedwire funds transfer system, and then to Lloyds via an international electronic funds transfer system known as "SWIFT" (Society for Worldwide Interbank Financial Telecommunications).[2] On September 20, 1999, these funds were credited to a U.S. Dollar account (Account No. 11287303). Upon transfer of these funds, Lloyds issued a credit advice to its customer, The Bond Partnership, notifying of the credit to account 11287303. In this credit advice Lloyds also notified the Bond Partnership of the additional instructions for the Bond Partnership, i.e. "REF HERCULES HOLDINGS FURTHER CREDIT MERIT QUEST MANAGEMENT INT LTD ACC 1800 4546." *Id.*

On October 25, 1999, the Tennessee Securities Division of the Department of Commerce and Insurance issued a cease and desist order directing Harris to refrain from violating the state securities laws by acting as an unregistered broker-dealer and selling unregistered securities. Harris received the order on November 1, 1999, and claims that he shut down the Merit Quest Enhancement Program that day.

In March 2000, Lloyds froze the Hercules Holdings accounts, which at the time contained just under $1,385,000.00. On July 13, 2000, Harris, through The Bank in Goodlettsville, attempted to recall the $205,000 wire transfer to the Bond Partnership Client Account at Lloyds' Bank. On July 14, 2000, Lloyds issued a response through the SWIFT system stating: "WE REGRET THAT OUR

_____

[2]SWIFT is utilized by thousands of banks throughout the world and provides a method for secure, standardized electronic banking.

BRANCH ARE [sic] UNABLE TO OBTAIN BEN[EFICIARY]'S AUTHORITY TO RETURN

PAYMENT. WE SUGGEST REMITTER CONTACT[] BENEFICIARY DIRECT."

On February 2, 2001, following a hearing, a Tennessee administrative law judge held that Harris had violated the Tennessee Securities Act of 1980 by selling unregistered securities without a license. *Hardcastle*, 170 S.W.3d at 80. Following a civil trial in Chancery Court, Harris was found liable to four of the investors he introduced to the Merit Quest Program for selling them unregistered investment contracts without a license. *Id.*

### B. Procedural History

Harris sued Lloyds in federal court in Tennessee on the basis of diversity jurisdiction. The essence of Harris's claim is that the "further reference" portion of the Wire Transfer Request Form, which listed Merit Quest and a 1800 4546 account number, should have alerted Lloyds when processing the wire transfer that the funds should have been placed in a trust account. Harris asserted the following state law causes of action: (1) failure to verify and follow wire instructions, (2) failure to follow bank procedure and protocol, (3) failure to know its customers, (4) failure to follow bank wire recalls, (5) misappropriation of funds, (6) breach of implied contract, (7) breach of fiduciary duty owed to Plaintiff, and (8) accounting and constructive trust.

Lloyds filed a motion to dismiss for lack of personal jurisdiction and a motion for summary judgment. The district court denied the motion to dismiss and granted the motion for summary judgment. Harris appeals the grant of summary judgment to Lloyds, and Lloyds cross-appeals the denial of its motion to dismiss. As noted below, because we find the issue of personal jurisdiction dispositive, we begin and end our discussion there.

### II. Analysis

This Court reviews the district court's denial of its motion to dismiss for lack of personal jurisdiction de novo. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). Because the district court did not conduct an evidentiary hearing, we must view the pleadings and affidavits "in the light most favorable to [Harris] and not consider the controverting assertions of [Lloyds]." *Id.* Also, the plaintiff need only present a prima facie case for jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). Harris bears the burden of establishing personal jurisdiction over Lloyds. *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005).

In order for a federal district court sitting in diversity to exercise personal jurisdiction over a defendant, the law of the forum state must authorize jurisdiction, and that exercise of jurisdiction must comport with the Due Process Clause. *Brunner v. Hampson*, 441 F.3d 457, 463 (6th Cir. 2006). This Court and the Tennessee courts have held that the Tennessee long-arm statute is coextensive with the limits of federal constitutional due process. *Intera*, 428 F.3d at 616; *Rice v. Karsch*, 154 F. App'x 454, 459 (6th Cir. 2005).[3]

## A. General Personal Jurisdiction

"General jurisdiction exists when a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Intera*, 428 F.3d at 615 (internal quotation marks and citation omitted).

---

[3]Tennessee's long-arm statute provided for personal jurisdiction over nonresidents on "[a]ny basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-214(a)(6). Furthermore, jurisdiction is also proper as to "[a]ny tortious act or omission within this state." *Id.* (a)(4). Thus, "'if a tortious act is committed outside the state and the resulting injury is sustained within the state, the tortious act and the injury are inseparable, and jurisdiction lies in Tennessee.'" *Neal v. Janssen*, 270 F.3d 328, 331 (6th Cir. 2001) (quoting Tenn. Code Ann. § 20-2-214(6)).

Lloyds claims that the district court erred in concluding that there was general jurisdiction because Lloyds does not maintain any office to transact business in Tennessee, is not registered to do business in Tennessee, has no employees in Tennessee, owns no property in Tennessee, and did not solicit any business in Tennessee.

In holding that Harris met his burden of establishing a prima facie case of general jurisdiction, the district court relied on the following contacts: (1) Lloyds had 108 customers with Tennessee addresses between 1964 and 2002; (2) Lloyds had a correspondent relationship with AmSouth Bank of Tennessee for the purpose of sending and receiving wire transfers at the direction of its customers, which included three SWIFT wire transfers related to this case that were sent at customers' directions through AmSouth; (3) Lloyds' representatives visited the Tennessee offices of three subsidiaries of national corporations on eight occasions, between November 1999 and June 2004, in connection with line of credit/loan syndicates, whereby Lloyds released funds through New York banks acting as agents for various corporations; and (4) a Lloyds' employee visited three Tennessee banks in an unsuccessful attempt to generate business for Lloyds.

These contacts are not sufficient to establish general jurisdiction over Lloyds. First, Lloyds' accounts with Tennessee addresses do not support the court's ruling. Lloyds points out that these 108 customers represented a mere 0.000675% of Lloyds 16 million account holders, and none of those accounts were opened after 2002. The fact that 108 account holders have Tennessee addresses is merely fortuitous–Lloyds markets and sells its accounts in the United Kingdom, not in Tennessee. Further, nothing in the record supports the district court's assumption that, merely because these accounts had Tennessee addresses on record, Lloyds "repeatedly transferred the Tennessee customers' funds as directed, provided customers with bank statements of account, and likely offered other incidental banking services." As Lloyds points out, any bank statements sent to Tennessee

would have been sent there because the customers listed the account address as Tennessee, not because Lloyds chose to create continuous and substantial consequences in Tennessee. The relationship of these account holders is best characterized as "unilateral," because Lloyds did not direct contacts at Tennessee. *Cf. Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1994) (holding that the nonresident defendant's acceptance of checks drawn from a Texas bank account, purchases of helicopters and related training trips did not create general jurisdiction).

Nor do the wire transfers between Lloyds and some Tennessee banks justify the exercise of general jurisdiction over Lloyds. "As federal courts have held on many occasions, [] customer-initiated bank-to-bank wire transfers do not establish the 'continuous and systematic' purposeful presence necessary to establish personal jurisdiction over a foreign bank." *Dtex, LLC v. BBVA Bancomer, S.A.*, 405 F. Supp. 2d 639, 645 (D.S.C. 2005) (and cases cited therein), *aff'd* 214 F. App'x 286 (4th Cir. 2007) (affirming on basis of district court's "comprehensive and exhaustive" opinion).

The sporadic visits by Lloyds' employees to Tennessee also do not support the exercise of jurisdiction. Again, this is not the type of "continuous and systematic conduct" required to support general jurisdiction over a defendant. *See Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co. Ltd.*, 91 F.3d 790, 793-94 (6th Cir. 1996) (holding that a foreign defendant's participation in a reinsurance pool as well as several prior reinsurance agreements with two local companies was insufficient to establish general jurisdiction); *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1045-46 (2d Cir. 1991) (holding that thirteen business trips of short duration over eighteen months was not continuous and systematic solicitation of business in the state to justify general jurisdiction).

The foregoing contacts amount to nothing more than random, fortuitous, and attenuated contacts that fail to establish that Lloyds purposefully directed its conduct at Tennessee. *See, e.g, Gregurek v. Swope Motors, Inc.*, 138 S.W.3d 882 (Tenn. Ct. App. 2003) (holding that auto repair shop was not subject to general jurisdiction where its employees attended occasional automobile auctions in Tennessee and 17 out of its 29,500 customers had Tennessee addresses); *Occidental Fire & Cas. Co. of N. Carolina v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 689 F. Supp. 564, 567-68 (E.D.N.C. 1988) (holding that North Carolina court lacked personal jurisdiction over Illinois bank even though some of its customers resided in North Carolina and loan proceeds were used in North Carolina); *see generally Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089-90 (6th Cir. 1989) (noting that the defendant's contacts were not sufficient to maintain general jurisdiction since the defendant never directly conducted business, held title to property, or retained employees in the forum state).

In short, the district court erred in concluding that the exercise of general personal jurisdiction was proper.

### B. Specific Personal Jurisdiction

The exercise of specific jurisdiction is proper where the claims in the case arise from or are related to the defendant's contacts with the forum state. *Intera*, 428 F.3d at 615. Both the Tennessee Supreme Court and this Court use the same three-part test to determine whether specific jurisdiction exists.

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Intera*, 428 F.3d at 615 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)); *see also Masada Investment Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985) (same).

In finding specific jurisdiction, the district court relied on the following facts: (1) Lloyds sent three wire transfers from Hercules Holdings to the account of Space Age Industries in Erwin, Tennessee (Hogsed's account); (2) Tennessee residents wired funds to The Bond Partnership at Lloyds; (3) Lloyds and its attorney responded to letters from Harris and other individuals in Tennessee about this litigation; and (4) Lloyds faxed a two-page bank statement to Hogsed detailing numerous transactions involving the transfer of substantial funds from Tennessee customers to the accounts of Hercules Holdings at Lloyds. The district court held that these facts demonstrated that Lloyds "purposefully availed" itself of the privilege of acting in Tennessee, the cause of action arose from Lloyds' activities within the state, and the acts had a substantial connection with Tennessee.

### 1. Purposeful Availment

Purposeful availment is essential to a finding of personal jurisdiction. *Calphalon*, 228 F.3d at 721. Purposeful availment exists where the defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). It protects a defendant from being haled into a jurisdiction for random, fortuitous, or attenuated contacts. *Id.*; *Intera*, 428 F.3d at 616; *Calphalon*, 228 F.3d at 721-22.

The district court erred in holding that Lloyds purposefully availed itself of the privilege of acting in Tennessee. The wire transfers accepted or confirmed by Lloyds from Tennessee and any wire transfers originated by Hogsed in the United Kingdom and sent to Tennessee cannot constitute purposeful availment, because none of those transfers were initiated by Lloyds. *See Calphalon*, 228

-10-

F.3d at 723 (finding no purposeful availment based on the defendant's communications and physical visits to Ohio on the basis that because the plaintiff corporation chose to be headquartered in Ohio where the defendant did not seek to further its business there); *Int'l Technologies Consultants v. Euroglas*, 107 F.3d 386, 395 (6th Cir. 1997) (holding that the foreign-defendant seller was not subject to personal jurisdiction in Michigan since the only reason it had contact with the state was because the plaintiff chose to reside there); *cf. CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1265-66 (6th Cir. 1996) (holding that the defendant's contacts with Ohio were sufficient to support the exercise of jurisdiction where defendant consciously reached out from Texas to Ohio to subscribe to CompuServe and sold his software over CompuServe's Ohio-based system).

Further, all of Lloyds' communications were in response to communications initiated by Harris and others in Tennessee. *Cf. Rice v. Karsch*, 154 Fed. App'x, 454, 460 (6th Cir. 2005) (holding that defendant's communications sent into Tennessee did not constitute purposeful availment because all were in response to communications initiated by the plaintiff). *See also Nationwide Mut. Ins. Co.*, 91 F.3d at 796 (holding that the defendant company's action in sending a representative to Ohio to negotiate a resolution of a prior dispute did not confer personal jurisdiction); *Wisconsin Elec. Mfg. Co. v. Pennant Prods. Inc.*, 619 F.2d 676, 678 n.10 (7th Cir. 1980) (noting that courts have declined to find specific jurisdiction when the defendant's contact with the forum state is limited to an attempt to resolve the parties' dispute); *cf. Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) (holding that purposeful availment may exist when a defendant makes phone calls and sends facsimiles into the forum state and such communications "form the bases for the action" of an intentional tort); *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988) (finding purposeful availment based on the defendant's letters and telephone call to Ohio, in which he threatened suit and had sought money to release his claim).

-11-

## 2.  Arising From

The "arising from" prong is met when the operative facts arise from the defendant's contacts with the state. *Intera*, 428 F.3d at 617.  Physical presence is not required; personal jurisdiction may exist over a defendant if he "purposefully directs communications into the forum, and those communications form the heart of the cause of action." *Id*. at 617-18 (internal quotation marks and citation omitted).

Without exception, all of Harris's claims in this case are based on its processing of Harris's incoming wire transfer in September 1999 in the United Kingdom.  As such, the claims do not "arise from" any actions by Lloyds within Tennessee

## 3.  Reasonableness

The reasonableness test of specific jurisdiction requires that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Intera*, 428 F.3d at 618. Factors to consider include: (1) the burden on the nonresident defendant; (2) the forum state's interest; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy. *Id.*  Consideration of these factors compels a conclusion that the exercise of specific jurisdiction was improper.  Although the plaintiff has an interest in relief, the burden on Lloyds of defending a lawsuit in Tennessee would be significant.  None of Lloyds' alleged wrongdoings occurred within Tennessee, and the United Kingdom has a significant interest in regulating the financial institutions operating within its borders, especially since the law of the United Kingdom applies.   Finally, as the Supreme Court observed in *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987), "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of

-12-

stretching the long arm of personal jurisdiction over national borders." In sum, the exercise of specific jurisdiction was also improper.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is **REVERSED**, and the matter **REMANDED** with instructions to dismiss without prejudice.