STEELCASE, INC., Plaintiff,

v.

MAR–MOL CO., INC., et al., Defendants.

Case No. 1:01–CV–678.

United States District Court,
W.D. Michigan,
Southern Division.

April 30, 2002.

Jon G. March, William M. Hohengarten, Washington, DC, for Plaintiff.

J. Terrance Dillon, Grand Rapids, MI, Jonathan P. Graham, Washington, DC, for Defendants.

## OPINION

QUIST, District Judge.

Plaintiff, Steelcase, Inc. ("Steelcase"), has sued Mar–Mol Co., Inc. ("Mar–Mol"), Vensavin, S.A. ("Vensavin"), and Savin Dominicana, C.X.A. ("Savin" and collectively with Mar–Mol and Vensavin the "Dealer Defendants"), Steelcase's former dealers in Puerto Rico, Venezuela, and the Dominican Republic; Hector Martinez Ramirez ("Martinez"), the chief executive officer and majority shareholder of each of the Dealer Defendants; and Grupo H.M. Corp. ("Grupo"), a corporation which, Steelcase alleges, is controlled by Martinez and exercises dominion and control over the business and affairs of the Dealer Defendants. Steelcase alleges claims for conversion, unjust enrichment, accounting/equitable tracing, breach of contract/price of

goods, and breach of agreement to pay. Steelcase also requests a declaratory judgment confirming that it is entitled to terminate its dealer relations with the Dealer Defendants. Steelcase's claims arise, at least in part, out of an alleged scheme by Defendants to steal funds belonging to Steelcase by operation of assignment of various purchase orders. Now before the Court are Defendants' motion for judgment on the pleadings for lack of personal jurisdiction and improper venue or, alternatively, motion to transfer venue pursuant to 28 U.S.C. § 1404(a) and Steelcase's motion for leave to amend its complaint.

### Facts and Procedural History

Steelcase is a Michigan corporation with its principal place of business in Grand Rapids, Michigan. Steelcase's primary business is the manufacture and sale of office furniture. Steelcase sells its products throughout the world through a network of independent dealers assigned to specified geographic areas. The dealers purchase products from Steelcase and re-sell them to end-customers. Mar–Mol is a Puerto Rico corporation and has been Steelcase's dealer for the geographic area of Puerto Rico since 1977. Vensavin is a Venezuela corporation and has been a Steelcase dealer for the geographic area of Venezuela since 1993. Savin is a Dominican Republic corporation and has been a Steelcase dealer for the geographic area of the Dominican Republic since 1996. Martinez is a resident of Puerto Rico, and Grupo is a Puerto Rico corporation. The place of incorporation of each corporate defendant is also its principal place of business.

In the early 1990's, Mar–Mol accumulated a substantial past-due balance on purchases of office furniture from Steelcase. On or about October 7, 1994, in order to address Mar–Mol's mounting debt, Steelcase and Mar–Mol entered into a work-out agreement which provided for an extended payment plan evidenced by several promissory notes secured by liens on all of Mar–Mol's assets. The work-out agreement provided that it was governed by Puerto Rico law. To prevent Mar–Mol from building up additional debt, Steelcase adopted new credit terms which required Mar–Mol to either: (a) pay 50% of the cost of the goods with the purchase order and the remaining 50% prior to shipment; or (b) assign to Steelcase the end-customer's purchase order, including all of Mar–Mol's rights under the purchase order.

Since 1997, Mar–Mol has guaranteed the majority of its purchases by assigning the purchase orders to Steelcase. The process of assignment begins when Mar–Mol's end-customer places a purchase order with Mar–Mol for Steelcase products. Mar–Mol then assigns the purchase order, including its right to payment, to Steelcase. The end-customer consents to the assignment, and the assignment documentation states that the end-customer should make payment to Steelcase. Steelcase then enters the assigned purchase order as an account receivable from the end-user. Because Steelcase's invoices are designed for billing dealers rather than distributors, Steelcase delivers its invoice to Mar–Mol and Mar–Mol acts on Steelcase's behalf to collect the payment from the end-customers. After receiving the invoice from Steelcase, Mar–Mol sometimes creates and delivers to the end-customer a summary invoice which directs that payment should be made to Steelcase. For its part, Mar–Mol receives a commission from Steelcase upon receipt of payment from the end-customer.

In spite of the assignment mechanism designed to avoid the build-up of substantial receivables from Mar–Mol to Steelcase, as of October 16, 2001, Mar–Mol's receivables account was $6,896,627. Steelcase alleges that it has discovered the rea-

son Mar–Mol's unpaid receivables are so high: Mar–Mol has been collecting and retaining some or all of the amounts due on the purchase orders assigned to Steelcase while at the same time representing to Steelcase that it would seek to collect those receivables, despite its knowledge that the end-customers had already paid those amounts. An example cited by Steelcase in its complaint is the Atento de Puerto Rico ("Atento") account. Atento placed a purchase order with Mar–Mol in the amount of $460,000 on October 1, 1999, for Steelcase goods. The terms of the purchase required a 35% payment at the time the order was placed and payment of the remaining 65% within 60 days. Pursuant to the established procedure, Mar–Mol assigned the purchase order to Steelcase and notified Atento of the assignment. Steelcase filled the Atento order, prepared invoices to Atento for the order, and sent the invoices to Mar–Mol for collection from Atento. Steelcase alleges that Mar–Mol then prepared invoices in its own name directing Atento to make payment directly to Mar–Mol rather than Steelcase, as required by the assignment documentation. On or about October 4, 1999, Atento sent a check in the amount of $161,000 payable to Mar–Mol for the 35% deposit, which Mar–Mol endorsed over to Vensavin. On October 7, 1999, the check was deposited into Vensavin's account, and that same day, Vensavin issued a check to Steelcase in the amount of $100,000 to be applied to amounts Vensavin owed Steelcase for purchases by its end-customers. Also on that day, Vensavin issued a second check to Steelcase in the amount of $50,000. Mar–Mol directed Steelcase to apply $30,372.47 of that amount to its account for excise taxes on goods shipped to Puerto Rico and the remainder ($19,627.53) to the assigned Atento account. Mar–Mol subsequently received and retained three additional checks payable to Mar–Mol from Atento totaling $294,531.99. In October 2001, Atento sent Mar–Mol an additional check for $11,763.26 for the remaining balance of the purchase order, which Mar–Mol remitted to Steelcase. Thus, of the $460,000 Mar–Mol received on the assigned Atento purchase order, Steelcase received only $31,390.79. Steelcase alleges that the Atento account represents only one of several instances where Mar–Mol has converted funds belonging to Steelcase.

Steelcase filed this case on October 19, 2001. In Counts I though III, Steelcase asserts claims for conversion, unjust enrichment, and accounting/equitable tracing for recovery of amounts Mar–Mol allegedly received under the assigned purchase orders. In Count IV, Steelcase asserts a claim against Mar–Mol, Vensavin, and Savin for breach of contract to recover amounts due on goods sold by Steelcase to those Defendants in addition to the amounts received on the assigned purchase orders. Count V alleges a claim against Mar–Mol for breach of its agreement to reimburse Steelcase for funds advanced for excise taxes. Finally, in Count VI, Steelcase seeks a declaratory judgment confirming its right to terminate the Dealer Defendants.

On November 26, 2001, the Court held a hearing on Steelcase's emergency motion for preliminary injunction and expedited discovery. Steelcase's representatives attended the hearing in person and Martinez, represented by attorney Jose Hernandez Mayoral ("Hernandez"), attended by telephone. Before reaching the merits, the Court inquired about the basis for personal jurisdiction. Steelcase's counsel responded by pointing to various documents, including agreements, minutes of meetings in Michigan, and affidavits, as providing a basis for personal jurisdiction over Defendants in this Court. (11/26/01 Hr'g Tr. at 6–10.) Hernandez did not argue that there was no basis for personal

jurisdiction over Defendants. He did argue, however, that venue was improper and indicated that Defendants would be filing motions to dismiss for improper venue or to transfer venue based upon the convenience of the parties and witnesses. (*Id.* at 6, 12.) Following the hearing, Martinez filed a motion to dismiss or transfer for improper venue and the Dealer Defendants and Grupo filed a separate motion to transfer venue. The Court ultimately struck both motions because Martinez filed his motion *pro se* and attempted to represent the corporate defendants after representing to the Court that attorney Hernandez would be appearing for all Defendants. Thereafter, Defendants retained their present counsel, and the Court allowed Defendants to file their answer. Defendants then filed the instant motion in which they request that the Court dismiss this case for lack of personal jurisdiction and/or improper venue, or, in the alternative, to transfer the case pursuant to 28 U.S.C. § 1404(a).

## Discussion

### I. Personal Jurisdiction[1]

Defendants contend that this case must be dismissed because the Court lacks personal jurisdiction. Defendants assert that jurisdiction is lacking because they have not purposefully availed themselves of the privilege of acting in Michigan, Steelcase's claims do not arise from Defendants' activities in Michigan, and it would unreasonable for the Court to exercise jurisdiction

over Defendants in light of their lack of connection to Michigan.

Because Defendants have challenged the Court's jurisdiction, Steelcase bears the burden of establishing the existence of personal jurisdiction. *Int'l Techs. Consultants, Inc. v. Euroglas S.A.,* 107 F.3d 386, 391 (6th Cir.1997). Steelcase may not rest on the pleadings but must set forth specific facts showing that this Court has jurisdiction. *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.1991).

A court may decide a motion to dismiss for lack of personal jurisdiction upon the affidavits alone, permit discovery in order to facilitate a more informed decision on the motion, or conduct an evidentiary hearing to resolve lingering factual questions. *Id.* If, as here, the court does not conduct an evidentiary hearing, it must view the pleadings and affidavits in the light most favorable to the plaintiff, and the court may not consider conflicting facts offered by the defendant. *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir.2002). In addition, where there has been no evidentiary hearing, the plaintiff need only present a prima facie case for jurisdiction. *Theunissen,* 935 F.2d at 1458.

This Court may exercise jurisdiction over Defendants only to the extent that a Michigan court could do so. *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996). Personal jurisdiction may be

---

1. Steelcase argues that Defendants waived their objection to personal jurisdiction through their conduct, both by participating in the November 26, 2001, preliminary injunction hearing without objecting to personal jurisdiction and by filing motions to dismiss and/or transfer for lack of venue. Although Steelcase makes a persuasive waiver argument, the Court will consider Defendants' personal jurisdiction argument on the merits because the Court raised the issue *sua sponte* at the preliminary injunction hearing and as-

sured Defendant's counsel that it would consider any argument submitted. While it is true that venue was the only issue raised in the motions Defendants filed immediately after the preliminary injunction hearing, the Court's concern with the waiver argument is that its comments during the hearing may have been reasonably interpreted by Defendants' counsel that the Court was allowing Defendants additional time to raise the issue of personal jurisdiction.

asserted only if it comports both with the state's long-arm statute and constitutional due process. *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 793 (6th Cir.1996). A defendant may be subject to personal jurisdiction on the basis of either or both general jurisdiction or limited jurisdiction. *Id.* "Limited jurisdiction extends only to claims arising from the defendant's activities that were either within Michigan or had an in-state effect," whereas "[g]eneral jurisdiction ... enables a court in Michigan to exercise jurisdiction over a [defendant] regardless of whether the claim at issue is related to its activities in the state or has an in-state effect." *Neogen Corp.*, 282 F.3d at 888 (citing *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989)). Steelcase does not claim that Defendants are subject to general jurisdiction, but it does argue that Defendants' contacts with Michigan subject them to limited jurisdiction. The reach of Michigan's long-arm statute has been construed as co-extensive with the limits of constitutional due process. *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir.1992); *Green v. Wilson*, 455 Mich. 342, 350–51, 565 N.W.2d 813, 816–17 (1997). The two inquiries thus merge into the single question of whether maintenance of the suit comports with due process. *Mich. Coalition of Radioactive Material Users, Inc.*, 954 F.2d at 1176. The question becomes whether the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)(quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). In deciding whether this requirement is met, the Court will apply the three-part test adopted by the Sixth Circuit:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968).

### A. Purposeful Availment

■ According to *Mohasco*, purposeful availment, the first of the three parts, is the "*sine qua non* for *in personam* jurisdiction." *Id.* at 381–82. This requirement is met if a party purposefully directs his activities toward residents of the forum state by reaching out beyond the boundaries of his own state, thus invoking the " 'benefits and protections' " of the forum's laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985)(quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)). The " 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity' of another party or a third person." *Id.* at 475, 105 S.Ct. at 2183 (citations omitted). Thus, jurisdiction may be maintained "where the [defendant's] contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state," such that the defendant should reasonably anticipate being subject to suit there. *Id.* at 475, 105 S.Ct. at 2184.

In *Burger King*, the Supreme Court held that jurisdiction over two Michigan residents by a Florida court did not offend

due process. Burger King, a Florida corporation with its principal offices in Miami, filed the suit alleging that the defendants-two franchisees of a Michigan store-breached the franchise agreement and infringed Burger King's trademarks. The franchise agreement was governed by Florida law and required the defendants to send all payments to Burger King's headquarters in Miami. Aside from attendance at a brief training course in Miami by one defendant, neither of the defendants had any physical connection to Florida. The Supreme Court held, however, that the parties' contract had a substantial connection to Florida. *Id.* at 479, 105 S.Ct. at 2186. While the Court rejected the notion that a plaintiff's contract with an out of state defendant, by itself, can establish sufficient minimum contacts in the plaintiff's home forum, it observed that other factors pertaining to the parties' relationship, such as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," may demonstrate the existence of sufficient contacts. *Id.* at 478–79, 105 S.Ct. at 2185. The Court found a substantial connection because: (1) instead of operating a local and independent business, the defendants chose to reach out to Florida and enter into a long-term franchise agreement which gave them the benefits of affiliation with a nationwide organization; (2) the 20–year franchise agreement envisioned a continuous and wide-ranging relationship between Burger King and the defendants; (3) the defendants' refusal to make payments to Burger King and continued unauthorized use of Burger King's trademarks caused foreseeable injuries to Burger King in Florida; (4) the defendants were aware that Burger King's corporate operations, including decisionmaking authority, were based almost exclusively in Florida and communicated on a continuous basis by mail and telephone with Burger King in

Florida during key negotiations; and (5) the franchise agreement provided that it was governed by Florida law. *Id.* at 479–82, 105 S.Ct. at 2186–87.

*Kerry Steel, Inc. v. Paragon Industries, Inc.,* 106 F.3d 147 (6th Cir.1997), and *LAK, Inc. v. Deer Creek Enterprises,* 885 F.2d 1293 (6th Cir.1989), are contract cases providing good illustrations of when the purposeful availment requirement will not be met. In *Kerry Steel,* the plaintiff, a steel company located in Michigan, submitted an offer to the defendant, a pipe fabricator located in Oklahoma, for the sale of steel coils. Following negotiations by telephone and fax, the defendant accepted the offer and sent purchase orders to the plaintiff in Michigan. The defendant took possession of the goods in Illinois and, after making partial payments to the plaintiff's post office box in Illinois and directly to the plaintiff in Michigan, refused to pay the full purchase price because the goods did not conform to the agreed quality standards. The defendant did not have any employees or offices in Michigan and had never been in Michigan to transact business. The Sixth Circuit held that the plaintiff failed to demonstrate that the defendant availed itself of the benefits and protections of Michigan law. Specifically, the court observed that the defendant did not reach out to the plaintiff in Michigan; rather, the plaintiff initiated the contact with the defendant in Oklahoma and the defendant "responded without leaving home." *Kerry Steel,* 106 F.3d at 151. The relationship between the parties was not substantial because the deal was "nothing more than an isolated transaction" and there was no evidence that the defendant "intended to create an ongoing relationship in Michigan with [the plaintiff]." *Id.* Furthermore, the court noted that there was no evidence connecting the subject matter of the contract or its performance to Michigan because the steel coils were located in

Illinois and title passed to the defendant there. *Id.*

In *LAK,* the defendant was an Indiana partnership owning substantial real estate in Florida. The defendant had no employees or assets in Michigan and had never transacted business in Michigan. The transaction in dispute arose when the defendant's representative in Florida received an unsolicited inquiry from a representative of the plaintiff, a Michigan corporation, regarding a possible purchase of real estate in Florida. The negotiations initially occurred in Florida and continued between the defendant and its lawyer in Indiana and the plaintiff and its lawyer in Michigan. Throughout that process, the parties exchanged letters and telephone calls, most of which were initiated by the plaintiff's lawyer, and the defendant's lawyer sent three draft purchase agreements to the plaintiff's lawyer. The contract was formed when the defendant signed the contract in Indiana. The Sixth Circuit held that these facts did not show that the defendant had sufficient contacts with Michigan to support jurisdiction. *LAK, Inc.,* 885 F.2d at 1300–03. First, the defendant did not advertise the Florida property for sale in Michigan or take any other action to "reach out" to Michigan. Instead, the plaintiff sought out the defendant in Florida, not to create a continuing relationship in Michigan, but to purchase the Florida property for cash. *Id.* at 1300. Second, the contract was formed in Indiana. Although the plaintiff conducted some of the negotiations in Michigan by telephone, that was largely for the plaintiff's convenience and was not a substantial consideration. *Id.* Finally, the telephone calls, letters, and contracts made and sent by the defendant to Michigan-the primary basis for the plaintiff's claim of jurisdiction-were "precisely the sort of 'random,' 'fortuitous' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions." *Id.* at 1301.

Steelcase cites the following facts to support its claim that Defendants have purposefully availed themselves of the privilege of doing business in Michigan:

- Steelcase has its headquarters and significant manufacturing facilities in Michigan. (Jackson Decl. ¶ 2, attached to Pl.'s Mem. Opp'n Defs.' Mot.)
- Defendants have had a continuing relationship with Steelcase as a dealer of Steelcase products for over twenty-four years, which began in 1978 when Mar–Mol submitted its Puerto Rico dealer application to Steelcase. (Waugh Decl. ¶ 3.A., Ex. A, attached to Pl.'s Mem. Opp'n Defs.' Mot.) Mar–Mol agreed as a condition of becoming a dealer that it would be required to submit annual financial statements to Steelcase. (*Id.*)
- In 1985, during a meeting with Steelcase in Michigan, Martinez urged Steelcase to eliminate its only other Puerto Rico dealer in order to give Mar–Mol a competitive advantage. (Klein Mem. of 10/11/85, Waugh Decl. Ex. B.) [2]
- In 1991, Defendants applied for and obtained the Steelcase dealership for Venezuela by sending application documents to Steelcase in Michigan. (Letter from Martinez to Solis of 5/1/91, Waugh Decl. Ex. C.)
- Defendants transmitted their purchase orders to Steelcase in Michigan. In recent years, Defendants transmitted their orders via "electronic data inter-

---

**2.** It is not clear from the record whether Steelcase ever agreed to Martinez's request to make Mar–Mol the exclusive dealer for Puerto Rico.

face," or "EDI," which requires the use of Steelcase's proprietary software. All Defendants transmitted their EDI purchase orders using Mar–Mol's EDI link with Steelcase from San Juan, Puerto Rico to Grand Rapids, Michigan. After accepting Defendants' purchase orders, Steelcase would send an acknowledgment via its EDI link to Mar–Mol. (O'Connor Decl. ¶ 3, attached to Pl.'s Br. Opp'n; Jackson Decl. ¶ 4.)

- Most of the goods Defendants ordered from Steelcase were manufactured in Michigan-a fact which Steelcase made known to Defendants. (O'Connor Decl. ¶ 4; Jackson Decl. ¶ 6.) Title to the goods manufactured in Michigan, as well as the risk of loss, passed to Defendants in Michigan. (O'Connor Decl. ¶ 7.) In addition, Defendants sent regular payments for the goods to Steelcase in Michigan. (Waugh Decl. ¶ 5.) Defendants would often send directions along with their payments instructing Steelcase how the payments should be applied to their accounts. (*Id.*)

- Many times, before submitting a purchase order, Defendants would request assistance from Steelcase in placing an order for non-standard or specially engineered goods. If the engineer approved the requested modification, Steelcase would provide Defendants with a price quotation and special order number for Defendants to use for the purchase order. (Jackson Decl. ¶ 3.)

- Defendants often requested and received pricing concessions or competitive discount authorizations ("CDAs") from Steelcase. The pricing entry was assigned a unique quote number which Defendants had to use when placing their order through EDI. (Waugh Decl. ¶ 4.)

- Steelcase made a special accommodation for Defendants by consolidating each order at Steelcase's Grand Rapids facilities until the order was complete rather than following its usual practice of shipping partial orders when container loads are achieved. (Jackson Decl. ¶¶ 7–8.) Steelcase agreed to provide this accommodation because Defendants did not have the facilities to consolidate orders themselves. (*Id.* ¶ 9.)

- Defendants often sent requests to Steelcase for transfers of funds from Steelcase to Defendants based upon anticipated commissions from purchase orders that Defendants had assigned to Steelcase. Steelcase would transfer funds to Defendants from time-to-time, although the commissions had not been earned, in order to help Defendants with their cash flow. (Waugh Decl. ¶¶ 10–12.) Also in response to requests by Defendants, Steelcase would advance funds to Defendants for payment of excise taxes on goods purchased under assigned purchase orders. (*Id.* ¶ 14.)

- The EDI User Agreement, which governed the ordering relationship between Defendants and Steelcase, was governed by Michigan law. (EDI User Agreement, Waugh Decl. Ex. D.)

- Defendants made telephone calls and sent faxes, e-mails, and letters to Steelcase on a regular, even daily basis. According to one Steelcase representative, Defendants sent her or made as many as 10 to 15 telephone calls and e-mails per day. (Jackson Decl. ¶ 9.) The letters Defendants sent to Steelcase dealt with a variety of business issues, including Mar–Mol's financial condition, terms of payment of Defendants' outstanding debt to Steelcase, confirmation of Vensavin's

status as Steelcase's exclusive dealer in Venezuela, and problems with a potential order in Venezuela. (Letter from Martinez to Myers of 7/10/92, Waugh Decl. Ex. E; Letter from Martinez to Hubling of 2/4/94, Waugh Decl. Ex. H; Letter from Martinez to Geiger of 12/29/00, Waugh Decl. Ex. J.) On November 9, 2000, Martinez sent a letter to Guillaume Alvarez, Steelcase's President, Latin America, confirming his request for a meeting to discuss a "confidential" subject having to do with the "expansion plans" of the "Grupo H.M. group of companies." (Letter from Martinez to Alvarez of 11/9/00, Alvarez Decl. Ex. A, attached to Pl.'s Br. Opp'n.) Martinez subsequently revealed in a meeting with Steelcase in Grand Rapids that he wanted to obtain the Steelcase Dealership for Argentina in order to improve his companies' profitability and reduce their outstanding debt to Steelcase. (Alvarez Decl. ¶ 4.)

- Over the course of their relationship with Steelcase, Defendants made several trips to Michigan to further their business and relationship with Steelcase. In 1985, Martinez attended a meeting in Grand Rapids to "review major current problems in the relationship between Mar–Mol and Steelcase." (Klein Mem. of 10/11/85, Waugh Decl. Ex. B.) In 1994, Martinez met with Steelcase on a monthly or bimonthly basis, often in Grand Rapids, after Steelcase almost terminated Mar–Mol's dealership. The meetings were held to enable Mar–Mol to continue its business relationship with Steelcase. (White Decl. ¶ 5, attached to Pl.'s Br. Opp'n.) Defendants' representatives also attended meetings in November 1999, November 2000, and May 2001 to resolve logistical issues and present their request for the Argentina dealership. (O'Connor Decl.

¶ 10; Alvarez Decl. ¶¶ 4, 6.) In addition, Martinez or other representatives of Defendants visited Steelcase's Grand Rapids facilities with potential customers in order to complete sales to those customers. (White Decl. ¶ 3.)

- Defendants sent the account assignment documents to Steelcase. Steelcase would not begin to manufacture goods ordered by Defendants until receipt of the assignment documents at Steelcase's headquarters in Michigan. (Waugh Decl. ¶ 7, Ex. S.) Defendants sent false and misleading communications regarding those accounts to Steelcase in Michigan. (*Id.* ¶ 9, Ex. R.) In addition, Defendants made false or misleading statements to Steelcase regarding assigned accounts while physically present in Michigan. (Alvarez Decl. ¶ 6.)·

Defendants assert that Steelcase has failed to demonstrate that they purposefully availed themselves of the benefits of the laws of Michigan because this case is factually similar to *Calphalon Corp. v. Rowlette,* 228 F.3d 718 (6th Cir.2000), in which the Sixth Circuit found the purposeful availment requirement lacking. Calphalon was an Ohio corporation and the defendant, Rowlette, was a Minnesota corporation. Rowlette was Calphalon's exclusive manufacturer's representative in Minnesota and several other states. Between 1980 and 1996, the parties' relationship was governed by a letter agreement. In 1996 and 1997, the parties entered into one-year agreements. Under those agreements, Rowlette was required, among other things, "to promote the sale of Calphalon's products, to keep Calphalon informed of market conditions, and to develop sales plans for customers." *Calphalon,* 228 F.3d at 720. The agreements provided that they were to be interpreted under Ohio law. During the term of the agree-

ments, Rowlette sent letters and faxes and made telephone calls to Calphalon in Ohio. Rowlette also made two trips to Ohio in 1996, one for a mandatory sales meeting and another to accompany a client on a tour of Calphalon's facilities. At the end of 1997, Calphalon informed Rowlette that it did not intend to renew the agreement. In May 1998, Rowlette's counsel sent Calphalon a letter notifying it of Rowlette's claims for breach of contract and unpaid commissions. Calphalon responded by filing a complaint in federal court in Ohio seeking a declaratory judgment that the termination was lawful and that it owed no commissions. The district court dismissed for lack of personal jurisdiction, and the Sixth Circuit affirmed. The Sixth Circuit agreed with the district court that "the mere existence of a contract between Rowlette and an Ohio citizen for seventeen months is insufficient to confer personal jurisdiction over Rowlette." *Id.* at 722. Examining the "quality" of the parties' relationship, the court of appeals concluded that Rowlette's contacts with Ohio were merely "fortuitous" or "attenuated" because Rowlette's obligations under the agreement were to be performed in Minnesota and other states, not including Ohio, and Rowlette was not seeking to exploit a market for Calphalon's products in Ohio. *Id.* at 723. The court also concluded that Rowlette's contacts by letter, telephone, and fax and his personal visits to Ohio occurred not because Rowlette chose to create continuous and substantial consequences in Ohio, but because Calphalon chose to have its headquarters there. According to the court, "Rowlette would have served as Calphalon's representative in the designated states, regardless of Calphalon's base of operation." *Id.*

The Court rejects Defendants' argument that *Calphalon* is controlling because there are substantial factual differences in this case which render it much closer to *Burger King* than to *Calphalon.* First, Steelcase has adequately demonstrated that Defendants reached out from Puerto Rico to Steelcase in Michigan in 1977 when Mar–Mol applied to become a Steelcase dealer for Puerto Rico, in 1993 when Vensavin applied to become a Steelcase dealer for Venezuela, in 1996 when Savin applied to become a Steelcase dealer for the Dominican Republic, and, most recently, in 2001, when Defendants sought a Steelcase dealership for Argentina. In contrast, there is no mention in *Calphalon* of any "reaching out" by Rowlette. Thus, it may well have been the case that Calphalon sought out Rowlette in Minnesota, similar to the circumstances in *Kerry Steel* and *LAK.* Second, there is an important difference between Rowlette's role as an exclusive manufacturer's representative and Defendants' role as Steelcase distributors. It appears from the facts stated in the opinion in *Calphalon* that Rowlette's primary functions were to develop markets in the assigned states, promote and obtain sales, and transmit the customers' purchase orders to Calphalon. Rowlette essentially acted as a mere conduit for Calphalon's business. Rowlette did not purchase Calphalon products made in Ohio, take title to them in Ohio, or pay for them in Ohio. Here, rather than acting as manufacturer's representatives of Steelcase, Defendants actually purchased goods manufactured in Michigan by Steelcase for sale to Defendants' own customers, took title to those goods in Michigan, and paid for them in Michigan.[3] Each order Defendants placed with Steelcase thus constitut-

---

**3.** The fact that Defendants assigned many of the purchase orders from their customers to Steelcase does not change the Court's analysis. The assignment mechanism was simply a security device Steelcase used to ensure payment for orders placed by Defendants and did not alter the fact that Defendants actually initiated the orders with Steelcase.

ed a separate instance of reaching out to Michigan. In this regard, this case is more like *In–Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220 (6th Cir. 1972), than *Calphalon.* In that case, an out-of-state defendant negotiated a contract for the purchase of a substantial number of transponders from an Ohio plaintiff. The plaintiff sued the defendant in Ohio after the defendant stopped payment on a check. Although much of the negotiations occurred in other states, the Sixth Circuit held that the first requirement of the *Mohasco* test was met because the defendant knew that the plaintiff was located in Ohio and had its production facilities there. The court also observed that a breach of contract, i.e., the defendant's failure to pay, would have substantial consequences within the state. *In–Flight Devices*, 466 F.2d at 226–27 (stating that "[t]he making of a substantial business contract with a corporation based in another jurisdiction has been held to be adequate to satisfy the requirements of the 'purposeful' test of *Southern Machine* "). *See also Norcold, Inc. v. Greg Lund Prods., Ltd.*, 109 F.Supp.2d 819, 825 (S.D.Ohio 2000)(holding that the purposeful availment requirement was satisfied where the parties had a thirty-year relationship; the defendant purchased products from the plaintiff in Ohio for distribution in Canada by purchase orders sent to Ohio; the plaintiff had numerous receivables from the defendant; the defendant's employees had routine business dealings with the plaintiff and occasionally visited the plaintiff's offices; and the defendant sent requests for products and made payment to Ohio on a monthly basis); *Advanced Polymer Sciences v. Phillips Indus. Servs.*, 34 F.Supp.2d 597, 601 (N.D.Ohio 1999)(holding that the South Carolina defendant satisfied the purposeful availment requirement where it telephoned the Ohio plaintiff to place an order for $200,000 of goods manufactured in Ohio; the risk of loss and title passed in Ohio; payment was to be sent to Ohio; and the parties' relationship, which lasted three months, was not a one-shot deal); *Ellison Windows & Doors, Inc. v. Vinyl Prods., Inc.*, No. Civ. A. 1:99CV00689, 2000 WL 33389671, at *4 (M.D.N.C. Jan.20, 2000)(concluding that a Missouri corporation had sufficient minimum contacts with North Carolina where the defendant placed an estimated 5,000 orders with the plaintiff between 1995 and 1999; the products ordered by the defendant were all manufactured in and shipped from North Carolina; payment was required in North Carolina; and the defendants officers visited the plaintiff in North Carolina to promote the relationship). Third, in this case, Defendants had an extended commercial relationship with Steelcase, spanning at least five years for Savin, eight years for Vensavin, and twenty-four years for Mar–Mol. While it is true that the parties in *Calphalon* also had an extended relationship of approximately seventeen years, *see Calphalon*, 228 F.3d at 720, for reasons not indicated in the opinion, the Sixth Circuit focused instead upon a seventeen month relationship-perhaps the period of the one-year agreements. *See id.* at 722. In any event, any suggestion that *Calphalon* requires or allows a court to ignore the length of the parties' relationship in assessing whether there was a substantial connection to the forum state must be rejected in light of the Supreme Court's direction that the nature and quality (including length) of the relationship should be considered in determining whether the defendant sought to establish systematic and continuous ties with the forum state. *See Burger King*, 471 U.S. at 479–80, 105 S.Ct. at 2186. Finally, Steelcase has alleged and presented evidence showing that Defendants made misrepresentations to Steelcase in Michigan, both by letter and in person,

regarding the status of assigned accounts and that such misrepresentations enabled Defendants to use Steelcase's funds for their own purposes, including the purchase of additional Steelcase products. This activity, by itself, may constitute purposeful availment. *See Neal v. Janssen,* 270 F.3d 328, 332 (6th Cir.2001). No such allegations were present in *Calphalon.*

When considered along with the numerous and routine business contacts Defendants had with Steelcase in Michigan by letter, telephone, e-mail, and in person, Defendants' activities described above are more than sufficient to show that Defendants engaged in conduct having on-going and substantial consequences in Michigan. In other words, Defendants' contacts with Michigan are not so isolated or attenuated that assertion of personal jurisdiction over Defendants would offend due process. Defendants' attempt to paint their relationship with Steelcase as being focused solely upon sales of Steelcase products in Puerto Rico, Venezuela, and the Dominican Republic and having absolutely nothing to do with Michigan flies in the face of substantial evidence showing that Defendants spent a significant effort over many years exploiting their contacts with Steelcase in Michigan. *Kerry Steel* and *Calphalon,* cases cited by Defendants in support of their position, are completely inapposite. Therefore, the purposeful availment requirement is satisfied, at least with respect to the Dealer Defendants.[4]

▇ Defendants make a separate argument that jurisdiction does not exist over Martinez or Grupo, who are named as defendants in the original complaint solely with respect to the claim for accounting/equitable tracing in Count III. With respect to Martinez, Defendants argue his contacts with Michigan had nothing to do with his "personal interests" but were related entirely to his position as an officer of the Dealer Defendants. This argument is based upon the general rule that "jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation." *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 929 (6th Cir.1974). However, an out-of-state corporate officer is not immune from jurisdiction in his individual capacity simply because he was acting in an official capacity.

> [W]here an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; *i.e.,* whether she purposefully availed herself of the forum and the reasonably foreseeable consequences of that availment.

*Balance Dynamics Corp. v. Schmitt Indus., Inc.,* 204 F.3d 683, 698 (6th Cir.2000).

Steelcase has presented evidence showing that Martinez was at the center of the conversion and played an active role in perpetrating the scheme. For instance, Martinez sent a letter to Steelcase dated March 30, 2001, in which he represented that Doral Bank would not agree to a 50% deposit with their order. (Letter from Martinez to Waugh of 3/30/01, Waugh

---

4. Defendants make much of the fact that the work-out agreement was negotiated in Puerto Rico and is governed by Puerto Rico law. After reviewing the complaint, however, the Court is unable to determine how the work-out agreement is relevant to Steelcase's claims other than as background information as to why Steelcase required special financing arrangements with the Dealer Defendants.

In other words, Steelcase is not seeking to enforce the promissory notes or security agreements created under the work-out agreement, nor does it allege a breach of the work-out agreement. Furthermore, the work-out agreement has nothing to do with Steelcase's conversion and accounting/equitable tracing claims, which appear to be the central focus in this case.

Decl. Ex. R.) Based upon that representation, Steelcase waived the deposit requirement and accepted an assignment of Defendants' right to receive payment from Doral Bank. Steelcase later learned that contrary to Martinez's representation, Defendants had received and retained a substantial deposit from Doral. (Waugh Decl. ¶ 9 & Ex. T.) Martinez also sent letters to Steelcase stating that many customers were not paying on the assigned purchase orders due to Steelcase errors and that Mar–Mol would make a strong collection effort on those accounts, when in fact Defendants had collected millions of dollars due under those purchase orders. (*Id.*, Ex. K.; DeBruin Decl. Ex. B, attached to Pl.'s Br. Opp'n.) Furthermore, Martinez benefitted personally from converted funds deposited into his bank account, which he used for a variety of personal expenses. (Martinez Dep. at 78–80, DeBruin Decl. Ex. A; Defs.' Supplemental Resp. to Pl.'s 1st Interrogs. & Doc. Req. at 6, DeBruin Decl. Ex. D.) These facts are more than sufficient to support jurisdiction over Martinez because his conduct was directed at Michigan and was calculated to cause Steelcase damage there. In addition, Steelcase has presented sufficient evidence to show that Martinez routinely disregarded corporate formalities and was essentially the alter ego of the Dealer Defendants. Under these circumstances, jurisdiction over the Dealer Defendants also supports jurisdiction over Martinez. *Kisiel v. RAS Sec. Corp.*, No. 3:01–CV–294–X, 2001 WL 912425, at *4 (N.D.Tex. Aug.9, 2001)("When a court finds one company to be the alter ego of another, the court may exercise personal jurisdiction over that company based on the other company's contacts.") Similarly, jurisdiction may properly be asserted over Grupo because Grupo benefitted when converted funds were deposited in its bank accounts and, like Martinez, should have known that ac-

ceptance and use of Steelcase funds would have substantial consequences in Michigan.

**B. Claim Arising from Defendants' Michigan Activities**

■ The second requirement for personal jurisdiction is that the claim must arise from the defendant's activities in the forum state. Defendants claim that there is no substantial connection between their activities in Michigan and Steelcase's claims because the nexus of each claim is in Puerto Rico, Venezuela, or the Dominican Republic. Defendants contend that Puerto Rico, Venezuela, and the Dominican Republic are the focus of Steelcase's claims because the alleged breaches of contract and conversion occurred there and that is where Steelcase's request for equitable tracing of proceeds and an accounting must occur.

While Defendants are correct that Steelcase's claims have a connection to Puerto Rico, Venezuela, and the Dominican Republic, the Court rejects their argument that the claims do not arise out of Defendants' activities in Michigan. As discussed above, Defendants engaged in a substantial amount of conduct in or aimed at Michigan in order to further their business. All of Steelcase's claims, whether based upon contract or tort, arise out of Defendants' activities in Michigan: Defendants sent purchase orders to Steelcase in Michigan; the goods were manufactured in Michigan and shipped from Michigan; Defendants took title to the goods in Michigan; and payment was to be made in Michigan. When Defendants assigned their purchase orders to Steelcase, Defendants sent the account assignment documents to Michigan. When Steelcase raised questions about why it was not receiving payments on the assigned purchase orders, Defendants made misrepresentations to Steelcase in Michigan designed to

deflect Steelcase's suspicions and enable Defendants to continue their conversion scheme. These activities were not one-time deals or isolated incidents, but occurred over the course of several years and were repeated frequently, with the end result being that Steelcase has suffered large financial losses in Michigan. *Cf. Int'l Techs. Consultants, Inc.*, 107 F.3d at 394 (citing *LAK* for the proposition that "the fact that the claimed injury to the plaintiff's purse may be said to have been suffered in Michigan is not material if the defendants did not purposefully avail themselves of the protection of Michigan law").

Defendants place great reliance on *Kerry Steel* in arguing that their contacts with Michigan were, at most, "minor." As indicated above, however, *Kerry Steel* involved substantially different facts. The Michigan plaintiff in that case sought out the defendant in Oklahoma to propose a one-time sale of steel coils that were neither manufactured nor located in Michigan. Given the tenuous connection of the claim to Michigan, the court concluded that "to subject an Oklahoma defendant to suit in Michigan simply because the defendant placed an order with a Michigan seller would be far from reasonable." *Kerry Steel*, 106 F.3d at 152. The result is different in this case because it includes all the necessities for jurisdiction that were lacking *Kerry Steel:* (1) an out-of-state defendant reaching out to an in-state plaintiff; (2) on a continuous basis; (3) for the purchase of goods manufactured and delivered in the forum state; and (4) failure to make payment required in the forum state. *See Norcold, Inc.*, 109 F.Supp.2d at 826 (concluding that the "arises from" requirement was satisfied, even though the case was similar to *Kerry Steel*, where the Canadian defendant "repeatedly and continuously" entered contracts to purchase the Ohio plaintiff's products for sale in Canada, the purchase orders were sent to Ohio, the plaintiff's manufacturing facilities were located in Ohio, the products were manufactured in and shipped to the defendant from Ohio, and the defendant's failure to pay for the goods impacted the plaintiff in Ohio). Likewise, Defendants' conversion of checks relating to purchase orders assigned to Steelcase for goods to be manufactured, delivered, and paid for in Michigan provides a much more compelling basis for the exercise of personal jurisdiction than was present in *Kerry Steel*. *See St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 592–93 (8th Cir.2001)(non-resident defendant's conversion of checks owed to a Minnesota plaintiff "necessarily injured [the plaintiff] in Minnesota"); *Moellers N. Am., Inc. v. MSK Covertech, Inc.*, 870 F.Supp. 187, 192 (W.D.Mich.1994)(holding that the out-of-state defendants' acts of circulating letters charging the plaintiff with patent infringement were calculated to cause damage to the plaintiff in Michigan and supported jurisdiction over the defendants in Michigan). Finally, for the reasons set forth above, the claims against Martinez and Grupo for an accounting and equitable tracing are directly related to their activity in or directed at Michigan. Thus, the second *Mohasco* requirement is satisfied.

## C. Reasonableness

■ The final factor the Court must consider is whether the exercise of personal jurisdiction over Defendants in Michigan is reasonable. Where a court finds that the first two *Mohasco* factors have been met, a presumption arises that the exercise of personal jurisdiction is proper. *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir.1998). Several factors that a court should consider with regard to reasonableness are: (1) the burden on the defendant of litigating in a distant forum; (2) the interest of the

forum state; (3) the plaintiff's interest in obtaining relief; and (4) the interest of other states in securing the efficient resolution of controversies. *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184. A defendant seeking to establish a lack of fairness bears a heavy burden. *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 483 (3d Cir.1993). The defendant must present a "compelling case" that other considerations would render personal jurisdiction unreasonable. *Id.* (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185).

Defendants contend that it would be unreasonable to require them to defend in Michigan because of the financial burden imposed upon them and because Steelcase, having the wherewithal to litigate in distant forums, could have filed this case in Puerto Rico. More specifically, Defendants contend that they have limited financial resources with which to defend because Steelcase has "shut off" the Dealer Defendants. Defendants also point out that their present counsel would not be saddled with mistakes made by attorney Hernandez, who was unfamiliar with practice on the U.S. mainland and in this Court, if Steelcase had filed the suit in Puerto Rico. These arguments are rejected. First, this is not a case where Defendants could not have anticipated that their actions could subject them to suit in Michigan. While it may be burdensome for Defendants, it is not unreasonable to require them to defend in Michigan based upon contacts they intentionally established. *See CompuServe, Inc. v. Patterson,* 89 F.3d at 1268 ("It may be burdensome for Patterson to defend a suit in Ohio, but he knew when he entered into the Shareware Registration Agreement with CompuServe that he was making a connection with Ohio, and presumably he hoped that connection would work to his benefit."). Second, Defendants have not demonstrated that they are destitute, and there is no reason why Steelcase

should be required to sue Defendants in Puerto Rico simply because Steelcase has more money, especially where Defendants have significant contacts with Steelcase's chosen forum. Finally, Defendants chose their prior counsel, and Steelcase had nothing to do with any alleged errors attorney Hernandez may have made.

Defendants next argue that Michigan has no special interest in adjudicating this case. This argument must be rejected. Michigan has a strong interest in this dispute because it involves goods manufactured in and shipped from Michigan. *Norcold, Inc.,* 109 F.Supp.2d at 827. Defendants' citation to *Kerry Steel* for the proposition that pecuniary harm to a plaintiff in the forum state is irrelevant to the forum's interest in resolving the claim is simply wrong. Financial loss to the plaintiff in the forum state is irrelevant only if the defendant lacks a substantial connection to the forum. That is not the case here. Moreover, Steelcase, as a resident of Michigan, has an interest in obtaining relief in this state.

Third, Defendants argue that it is unreasonable for this Court to exercise personal jurisdiction because the dispute will be governed by Puerto Rico law, specifically, the Puerto Rico Dealer's Protection Act, 10 P.R. Laws Ann. § 278a (1994). While this *may* be true with respect to Steelcase's claim in Count VI, it is by no means clear that Puerto Rico law will govern the entire dispute and it is possible that Michigan law will apply at least to the tort claims, if not the contract claims. More importantly, however, Defendants have not shown why it would be prejudiced by this Court's application of Puerto Rico law. *Id.* at 827.

Fourth, Defendants argue that in assessing whether it would be fair to assert personal jurisdiction over them, the Court should bear in mind that Savin and Vensa-

vin are international defendants. The Supreme Court has recognized the special considerations which must be taken into account when determining whether a foreign defendant should be subjected to personal jurisdiction in United States courts. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). So long as a foreign defendant has minimum contacts with the forum state, however, "the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.* Because the Court has already concluded that all Defendants have substantial contacts with Michigan, the fact that Savin and Vensavin are international defendants is not an impediment to jurisdiction.

Finally, Defendants argue it would be unfair for the Court to exercise jurisdiction over Defendants because Steelcase is attempting to manipulate the Court's processes by taking inconsistent positions. Defendants assert that by now arguing that its claims arise out of Defendants' contacts with Michigan, Steelcase is attempting to sidestep its argument at the preliminary injunction hearing that Defendants possessed property in Puerto Rico that is central to its claims in this case. The Court finds nothing inconsistent about Steelcase's arguments because they addressed different issues. In fact, at the preliminary injunction hearing, Steelcase's counsel explained to the Court why there was both a basis for personal jurisdiction over Defendants and a basis for the Court to issue a prejudgment restraining order prohibiting Defendants from disposing of assets in their possession belonging to Steelcase. Whether the Court has the authority to freeze assets which may be the subject of equitable relief is separate from the question of whether Defendants' conduct, which gave rise to the claim for equitable relief, is based upon Defendants' activities in the forum state. Therefore,

Defendants have not shown that the exercise of personal jurisdiction would be unreasonable.

## II.  Venue

■ Defendants contend that venue is improper under 28 U.S.C. § 1391(a). That statute provides:

> A civil action where jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). When a defendant raises a venue challenge, the plaintiff has the burden of proving that venue is proper in the forum state. *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*, 927 F.Supp. 731, 735 (S.D.N.Y.1996). In addition, where the plaintiff alleges multiple claims, the plaintiff must show that venue is proper with respect to all claims. *Id.* at 736. Steelcase asserts that the basis for venue is § 1391(a)(2) because a substantial part of the acts or omissions giving rise the claims occurred in this district.

The Sixth Circuit addressed the "substantial connection" requirement in § 1391(a)(2) in *First of Michigan Corp. v. Bramlet*, 141 F.3d 260 (6th Cir.1998). The court stated that the purpose of the 1990 amendment to § 1391(a)(2) was to replace a standard which provided for venue only in the district in which the claim arose

with a standard allowing venue in any district having a substantial connection to the claim. The court explained,

> [t]he fact that substantial activities took place in district B does not disqualify district A as proper venue as long as "substantial" activities took place in A, too. Indeed, district A should not be disqualified even it is shown that the activities in district B were more substantial, or even the most substantial.... If the selected district's contacts are "substantial," it should make no difference that another's are more so, or the most so.

*Id.* at 263 (quoting commentary to 28 U.S.C. § 1391). Thus, venue is proper in any district having a substantial connection with the events giving rise to the claim.

The Court concludes that the Western District of Michigan easily meets the "substantial connection" requirement with respect to each of Steelcase's claims. Steelcase has its headquarters and significant manufacturing facilities in this district. (Jackson Decl. ¶ 2.) Defendants transmitted their purchase orders to Steelcase in Michigan through Steelcase's "electronic data interface" ("EDI"), and Steelcase notified Defendants of its acceptance of the purchase orders by sending an acknowledgment from Michigan to Defendants through the EDI link. (*Id.* ¶ 5.) Most of the goods Steelcase sold to Defendants, either directly or indirectly through the assigned accounts, were manufactured in Michigan. (O'Connor Decl. ¶ 4; Jackson Decl. ¶ 6.) Title to and the risk of loss of the goods purchased by Defendants passed to Defendants in Michigan. (O'Connor Decl. ¶ 7.) Defendants sent their payments for goods to Steelcase in Michigan. (Waugh Decl. ¶ 5.) In addition, Defendants sent account assignment documents to Steelcase in Michigan, (*id.* ¶ 7, Ex. S.), sent false and misleading communications regarding those assigned accounts to Steelcase in Michigan, (*id.* ¶ 9, Ex. R.),

made false or misleading statements to Steelcase regarding assigned accounts while physically present in Michigan, (Alvarez Decl. ¶ 6.), and obtained advanced payment of commissions from Steelcase in Michigan on assigned purchase orders while failing to disclose that the amount actually received was far in excess of the amount represented (Waugh Decl. ¶ 11, Exs. Q, U.). While Puerto Rico might be the forum with more or even the most substantial activities relating to Steelcase's claims, as has been shown, this district also has a substantial connection to those claims.

### III. Transfer to a More Convenient Forum

■ Defendants have also moved for transfer of venue under 28 U.S.C. § 1404(a) to the District of Puerto Rico because that district is a more convenient forum. As the Court noted during the preliminary injunction hearing, even if personal jurisdiction is present, an action may still be transferred if a more convenient forum exists. *See Martin v. Stokes*, 623 F.2d 469, 474 (6th Cir.1980).

On a motion to transfer under § 1404(a), the moving party bears the burden of proving why a court should transfer the action. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir.1995); *Factors, Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978). This burden is a heavy one and requires the moving party to show that the balance of factors weighs strongly in favor of transfer. *See Holiday Rambler Corp. v. Am. Motors Corp.*, 254 F.Supp. 137, 139 (W.D.Mich. 1966).

In considering a motion to change venue under § 1404(a), "a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as

systemic integrity and fairness...." *Moses v. Business Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir.1991). The private interests of the parties include:

> (1) the convenience to the parties; (2) the convenience of witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems indicating where the case can be tried more expeditiously and inexpensively; and (7) the interests of justice, a term broad enough to cover the particular circumstances of each case, which in sum indicate that the administration of justice will be advanced by a transfer.

*Campbell v. Hilton Hotels Corp.*, 611 F.Supp. 155, 157 (E.D.Mich.1985)(quoting *Schneider v. Sears*, 265 F.Supp. 257, 263 (S.D.N.Y.1967)). Public interest factors include: (i) the enforceability of the judgment; (ii) practical considerations affecting trial management; (iii) docket congestion; (iv) the local interest in deciding local controversies at home; (v) the public policies of the fora; and (vi) the familiarity of the trial judge with the applicable state law.[5] *See Jumara*, 55 F.3d at 879–80.

### 1. Private Interest Factors

### a. Plaintiff's Choice of Forum

One of the most significant factors in considering whether venue should be transferred is the plaintiff's choice of forum. In general, a plaintiff's choice of forum is entitled to substantial consideration in balancing the § 1404(a) factors. *See Warrick v. Gen. Elec. Co. (In re Warrick)*, 70 F.3d 736, 741 (2d Cir.1995)(per curiam)(quoting *A. Olinick & Sons v. Dempster Bros., Inc.*, 365 F.2d 439, 444 (2d

Cir.1966)). This is especially true where the plaintiff also resides in the chosen forum. *FUL, Inc. v. Unified Sch. Dist. No. 204*, 839 F.Supp. 1307, 1311 (N.D.Ill. 1993).

Defendants contend that Steelcase's choice of forum should be given less weight because there is no significant relationship between this district and the facts giving rise to the lawsuit. Defendants contend that all of the operative facts occurred in Puerto Rico because that is where the alleged conversion occurred. Where the plaintiff does not reside in the chosen forum or where none of the operative facts occurred in that district, courts assign less weight to the plaintiff's choice of forum. *See Lindley v. Caterpillar, Inc.*, 93 F.Supp.2d 615, 617 (E.D.Pa.2000); *Icon Indus. Controls Corp. v. Cimetrix, Inc.*, 921 F.Supp. 375, 384 (W.D.La.1996). Steelcase has its principal place of business in this district and, as the Court noted above, this district has some connection to the underlying dispute. Puerto Rico is the place where the act of conversion allegedly occurred. However, that does not mean there is no connection between this district and Steelcase's claims. Part of the underlying facts forming the basis for the conversion occurred in this district, and Defendants misrepresented the status of the assigned accounts to Steelcase while in this district. In addition, the claims based on the assigned accounts are only one aspect of the case. Steelcase also has claims for the price of goods purchased and breach of the agreement to reimburse Steelcase for advances to Defendants, which have a substantial connection to this district. Therefore, the Court will give Steelcase's choice of forum substantial weight.[6]

---

**5.** Although the moving party must also show that the action could have been brought in the transferee forum, *Wine Markets Int'l, Inc. v. Bass*, 939 F.Supp. 178, 179 (E.D.N.Y.1996), there is no dispute that Steelcase could have filed the case in the District of Puerto Rico.

**6.** The cases cited by Defendants as support for their argument that Steelcase's choice of

### b. Convenience of the Parties

At first blush, the convenience of the parties factor does not seem to favor either party because it is probably just as inconvenient for Defendants to litigate in Michigan as it is for Steelcase to litigate in Puerto Rico. Defendants contend that this factor weighs in their favor, however, because it is less of a financial burden for Steelcase than for Defendants to litigate in a distant forum. The relative size and resources of the parties is a consideration in assessing inconvenience to the parties. *Country Maid, Inc. v. Haseotes*, 312 F.Supp. 1116, 1118 (E.D.Pa.1970)("This vast difference in size and scale of operations necessarily magnifies the extent of any inconvenience the plaintiff might experience as a result in favor of the defendants"); *Meek & Assocs., Inc v. First Union Ins. Group*, No. CIV. A. 99–2519–CM, 2001 WL 58839, at *5 (D.Kan. Jan.18, 2001)(stating that "[t]he parties' relative ability to litigate in a distant forum is a factor to consider").

Defendants argue that they lack the financial resources to litigate in Michigan because Steelcase has terminated their dealerships, whereas Steelcase, with its worldwide network of dealers, has a more substantial ability to litigate in distant forums. There is no reason to doubt that Steelcase's termination of the Dealer Defendants has severely, if not entirely, impacted their ability to conduct business. But that does not mean Defendants cannot afford to litigate in Michigan because Mar-

tinez effectively controls the Dealer Defendants, including funds flowing into and out of those corporations, and Defendants have not shown that it would be a financial hardship for Martinez to litigate here. It is also difficult to accept Defendants' claim of financial hardship in light of their admission that they have received approximately $6.7 million from assigned accounts over the last two years and considering that they have retained counsel in both Grand Rapids and Washington D.C. Litigating in Puerto Rico rather than Michigan is not likely to be less expensive for Defendants because their Washington D.C.-based lead counsel would be required to travel from Washington D.C. to Puerto Rico, which is much further away than Grand Rapids, for hearings, trial, and discovery, and would probably still be required to travel to Grand Rapids to conduct discovery. Also, Defendants would still have to retain local counsel in Puerto Rico. Thus, while the disparity in financial resources between Steelcase and Defendants is a consideration weighing in favor of transfer, the Court concludes that it does not merit substantial weight.

### c. Convenience of the Witnesses

Defendants also contend that it would be more convenient for the witnesses if trial is held in Puerto Rico. Convenience of witnesses is perhaps the most important factor in the transfer analysis. *See Meek & Assocs., Inc.*, 2001 WL 58839, at *4; *Gerling Am. Ins. Co. v. FMC Corp.*, No. 97

---

forum should be given minimal weight are distinguishable and do not support substantially reducing the weight to be given Steelcase's chosen forum. In *Carolina Casualty Co. v. Data Broadcasting Corp.*, 158 F.Supp.2d 1044 (N.D.Cal.2001), the plaintiff did not reside in the district. Although the court ultimately held that transfer was proper, the court concluded that the plaintiff's choice of forum was entitled to "some deference" because there was "some connection" between

that district and the underlying dispute. *Id.* at 1048. In *Lindley v. Caterpillar, Inc.*, 93 F.Supp.2d 615 (E.D.Pa.2000), the plaintiff resided in Florida, and the operative facts occurred there. Although the court held that transfer was proper, it did not entirely disregard the plaintiff's choice. *Id.* at 617. In contrast to those cases, Steelcase has its principal place of business in this district, and there is a substantial connection between this district and the underlying facts.

Civ. 6473(LMM), 1998 WL 410898, at *3 (S.D.N.Y. July 22, 1998). However, while "convenience to the witnesses is often recognized as the most important factor to be considered" in deciding a change of venue motion, "[i]t is the convenience of non-party witnesses, rather than employee witnesses ... that is the more important factor and is accorded greater weight." *Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co.*, 844 F.Supp. 1163, 1166 (S.D.Tex.1994).

Defendants do not argue that trial in Michigan would be inconvenient for their employee-witnesses. Rather, they assert that all non-party witnesses, i.e., the customers whose purchase orders were assigned by Defendants to Steelcase, are located in Puerto Rico. Defendants assert that the lack of compulsory process over these witnesses in Michigan weighs heavily in favor of transfer because the testimony of these witnesses may be critical in establishing the circumstances of their payments to Defendants and/or Steelcase.

To substantiate a claim of inconvenience to witnesses, a party should provide each witness's name and a summary of the anticipated testimony to enable the court to assess the significance of the testimony. *See Thomas v. Home Depot, U.S.A., Inc.*, 131 F.Supp.2d 934, 937 (E.D.Mich.2001). Defendants have not provided any specifics about the witnesses whose testimony they claim may be "critical". In order to prevail on its claims regarding the assigned accounts, Steelcase will have to establish that the customers whose accounts were assigned to Steelcase paid Defendants. However, Steelcase need not call witnesses from those customers to establish payment if it can do so by other means. Steelcase asserts that it can prove the customers made payment to Defendants without calling witnesses because Defendants have admitted that they received over $6.7 million from end-customers on the assigned accounts and have provided Steelcase with copies of the checks they received and deposited into their accounts. Although Defendants imply that the customer witnesses' testimony may provide a legitimate explanation for why Defendants received and retained the payments, they have not substantiated this assertion with information about who would testify and what the testimony would show.

In contrast, Steelcase has identified several current and former Steelcase employee-witnesses located in this district who would be inconvenienced by having to attend trial in Puerto Rico and has explained the nature of their testimony. (Pl.'s Mem. Opp'n at 50–51.) Although the convenience of employee-witnesses is generally entitled to less weight than the convenience of non-witnesses, it is still a consideration. Steelcase's demonstration of inconvenience to its employee witnesses is stronger than Defendants showing of inconvenience to non-party witnesses located in Puerto Rico. Thus, the convenience of witnesses factor weighs against transfer.

### d. Location of Physical Evidence

The location of physical evidence, such as documents, is a factor to be considered in determining convenience. *Warrick*, 70 F.3d at 741. Defendants argue that this factor weighs in favor of transfer because most of their documents are located in Puerto Rico. (Martinez Aff. ¶ 14.) Defendants have not shown that there is a disproportionately larger number of documents in Puerto Rico versus Grand Rapids, nor do they assert that it would be more difficult for them to produce their documents in this district. Without some indication of why it would be overly burdensome for Defendants to produce their documents in this district, transfer based upon location of physical

evidence would simply result in shifting inconvenience from one party to another. Therefore, this factor is not entitled to significant weight. *See Scheidt v. Klein,* 956 F.2d 963, 966 (10th Cir.1992)(stating that the "[d]efendant never attempted to explain, let alone substantiate, why [boxes of] documents could not be sifted through (at his Florida offices) and the probative ones shipped at relatively minor cost to Oklahoma for trial").

### 2. Public Interest Factors

### a. Docket Congestion/Caseload

■ Steelcase contends that a comparison of the docket conditions in this district with those in the District of Puerto Rico shows that the case will likely be resolved sooner if it remains in this district. The public interest in prompt resolution of cases is a consideration in the transfer analysis, although a court "should not ... look to docket conditions in order simply to serve the court's own convenience." *Fannin v. Jones,* 229 F.2d 368, 369 (6th Cir.1956)(per curiam). On the other hand, raw figures comparing caseloads are entitled to little weight. *Micheel v. Haralson,* 586 F.Supp. 169, 172 n. 5 (E.D.Pa.1983).

According to the 2001 Federal Court Management Statistics published by the Administrative Office of the United States Courts, for the twelve-month period ending September 30, 2001, the judges in this district had an average of 322 cases pending while the judges in the District of Puerto Rico had an average of 391 cases pending. The median times from filing to disposition of civil cases were 8 months in this district and 13 months in the District of Puerto Rico. However, the median time from filing to trial of civil cases in this district, 23.7 months, was longer than in the District of Puerto Rico, 17 months. On the other hand, in the District of Puerto Rico, 362 civil cases (15.9%) were over three years old while in this district only

21 civil cases (1.9%) were over three years old. While these figures do not weigh strongly either way, they suggest that the case would be resolved sooner in this district or, at the very least, in the same amount of time as in Puerto Rico. Thus, this factor weighs against a transfer.

### b. Forum's Familiarity with the Governing Law

In general, the court that sits in the state whose substantive law will govern the case is in the best position to apply that state's laws. *See Detroit Coke Corp. v. NKK Chem. USA, Inc.,* 794 F.Supp. 214, 219 (E.D.Mich.1992)(citing, among others, *Heller Fin., Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1293 (7th Cir.1989)). Where the question of state law is not complex, however, this factor should be given little or no weight. *See Scheidt,* 956 F.2d at 966 (finding that the relative simplicity of common law fraud and breach of contract claims under Florida law were not a significant concern in the transfer analysis).

Defendants assert that a transfer is warranted because Puerto Rico law will apply. While Puerto Rico law may apply to some aspects of this case, it is entirely possible that Michigan law will apply to a significant number of issues. *See Hall v. Gen. Motors Corp.,* 229 Mich.App. 580, 585, 582 N.W.2d 866, 868 (1998)(noting that Michigan uses an "interest analysis" in tort cases to determine choice-of-law which most frequently favors Michigan's laws). Furthermore, Defendants have not shown that the possible issues under Puerto Rico law would be complex. The Court will thus give this factor no weight.

### c. Judicial Economy

Judicial economy is included among the "interest of justice" factors. *See Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 220–

21 (7th Cir.1986). Although this case is still in its early stages, it has been pending for almost five months, and the Court has already invested time familiarizing itself with the dispute. Transfer of the case would require another judge to spend time getting up to speed on the case and would probably delay the final resolution by several months. Therefore, this factor weighs against a transfer.

### 3. Balancing the Transfer Factors

Considering the factors relevant to the instant motion, the Court finds that there is no single factor or combination of factors that tips the balance in favor of transferring the case. Steelcase's choice of forum is the starting point, and that factor is entitled to substantial weight. The District of Puerto Rico does have a substantial connection to this case, perhaps even more substantial than this district. However, Defendants have not demonstrated that adjudication of the case in this district will be substantially more inconvenient for Defendants or any witness than would occur for Steelcase if the case were transferred. In effect, granting Defendants' motion would simply result in shifting the inconvenience from one party to another. Finally, the interests of justice factors, especially the interest in efficient administration of federal courts, weigh against transfer. Therefore, the Court will deny the motion to transfer venue.

## IV. Motion to Amend

Steelcase has moved for leave to amend its complaint to: (1) add a count alleging fraud against all Defendants; (2) add Savin, Grupo, and Martinez to the already-pending conversion and unjust enrichment claims; and (3) revise the allegations in the complaint to conform to the facts obtained during expedited discovery.

Under Rule 15(a) of the Federal Rules of Civil Procedure, once a responsive pleading has been filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). Rule 15(a) also provides that "leave shall be freely given when justice so requires." *Id.* The mandate that "leave shall be freely given" embodies "the principle that cases 'should be tried on their merits rather than the technicalities of the pleadings.'" *Moore v. City of Paducah,* 790 F.2d 557, 559 (6th Cir.1986)(per curiam)(quoting *Tefft v. Seward,* 689 F.2d 637, 639 (6th Cir.1982)). *See Johnson v. Ventra Group, Inc.,* No. 96–1463, 1997 WL 468332, (6th Cir. Aug.13, 1997)(per curiam). However, a court is not obliged to grant an amendment simply because a motion is made. *See Johnson v. Ventra Group, Inc.,* No. 96–1463, 1997 WL 468332, (6th Cir. Aug.13, 1997)(per curiam). "A motion to amend a complaint should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Crawford v. Roane,* 53 F.3d 750, 753 (6th Cir.1995); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Steelcase's motion comes at an early stage in the case, before entry of a Rule 16 scheduling order and commencement of a formal discovery period. Under these circumstances, there is no basis to conclude that Steelcase's proposed amendment is brought in bad faith or untimely or that Defendants will be prejudiced by the amendment. In addition, having reviewed Steelcase's proposed claim of fraud, the Court cannot say that the amendment is futile because it fails to state a claim or would be subject to summary judgment. Defendants' sole objection to the amendment is based upon its argument, rejected above, that the Court lacks jurisdiction over Defendants. The Court's analysis finding personal jurisdiction with respect to the contract, conversion, and account-

ing/equitable tracing claims applies equally to the fraud claim. As noted above, those claims are based upon Defendants' in-state and out-of-state misrepresentations regarding the status of assigned accounts, which induced Steelcase to continue accepting assignments from Defendants while Defendants continued to collect funds that belonged to Steelcase. Therefore, the Court has personal jurisdiction over Defendants with respect to the fraud claims, and the motion for leave to amend will be granted.

### *Conclusion*

For the foregoing reasons, the Court will deny Defendants' motion for judgment on the pleadings for lack of personal jurisdiction and improper venue or, alternatively, to transfer pursuant to 28 U.S.C. § 1404(a) and grant Steelcase's motion for leave to amend.

An Order consistent with this Opinion will be entered.

### *ORDER*

In accordance with the Opinion filed this date,

**IT IS HEREBY ORDERED** that Defendants' Motion For Judgment On The Pleadings For Lack Of Personal Jurisdiction And Improper Venue Or, Alternatively, To Transfer Pursuant To 28 U.S.C. § 1404(a) (docket no. 52) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Leave To Amend Complaint (docket no. 69) is **GRANTED.**